In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-1507 & 04-1535

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RODNEY MCLEE and
VICKI MURPH-JACKSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 635—**Charles P. Kocoras**, *Judge.*

ARGUED FEBRUARY 22, 2005—DECIDED FEBRUARY 2, 2006

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A jury convicted Rodney McLee of cocaine conspiracy and related drug-trafficking crimes and also two firearms offenses. McLee's wife and codefendant, Vicki Murph-Jackson, was convicted with him on the drug charges. Both received lengthy prison sentences. Their appeals have been consolidated, and numerous trial and sentencing errors are alleged. McLee argues the evidence was insufficient to convict him on the firearms charges. Both defendants contend that certain evidence predating the conspiracy was erroneously admitted, that their right of cross-examination was erroneously restricted, and that the government's wiretap evidence should have

been excluded. They also argue that factual findings made by the district court at sentencing were clearly erroneous. Finally, McLee challenges his sentence under *United States v. Booker*, 543 U.S. 220 (2005). We affirm the defendants' convictions and order a limited remand as to both defendants in accordance with *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

Trial evidence established that McLee and Murph-Jackson were intimately involved in all aspects of a large-scale cocaine distribution operation run from the south side of Chicago by a man named Kevin Turner. Turner and other subordinate members of the conspiracy were indicted along with McLee and Murph-Jackson. Turner pleaded guilty to the conspiracy charge and testified against McLee and Murph-Jackson under the terms of his plea agreement. Others charged in the conspiracy— Steve Brown, Dymica Hilt, and Kevin Turner's brother Prince Turner, Jr.—also entered into plea agreements with the government and testified for the prosecution.

Testimony established that upon Turner's release from federal prison on drug-related charges in 1996, he quickly resumed his previous occupation as a seller of cocaine. Turner enlisted the services of his friend McLee and later McLee's girlfriend and future wife, Murph-Jackson, both of whom participated in the operation by delivering drugs to customers, packaging and storing drugs for later delivery, and collecting money from customers. Specifically, Turner testified that he would purchase large quantities of cocaine from his suppliers—as much as 50 kilograms a month—and store it at the home occupied by McLee and Murph-Jackson. McLee and Murph-Jackson, sometimes assisted by others, would weigh and divide the cocaine into smaller amounts and package it for future sale. McLee also cooked cocaine

into crack. When Turner arranged a sale with a purchaser, he would contact McLee and either McLee or Murph-Jackson would deliver the drugs, collect the money, and hold it until arrangements could be made for its transfer to Turner.

McLee and Murph-Jackson were paid a salary by Turner for their services. McLee was originally Turner's right-hand man and the person trusted to have control over the cocaine during the period between purchase and sale. However, toward the end of 1998, when Turner became convinced that McLee was skimming cocaine for sale to his own customers, McLee was demoted from his "managerial" position and replaced in this capacity by Murph-Jackson. From this point until the conspirators were arrested in 2002, McLee still packaged drugs, made deliveries, and collected money, but did so under the supervision of his wife.

Two or three times a week from late 1997 to July of 1999, Turner sold cocaine in a wholesale fashion to another drug dealer named Vernon Everett. Everett testified that on some occasions McLee would deliver cocaine he had ordered from Turner, often accompanied by Murph-Jackson. On other occasions Everett would travel to various locations controlled by Turner where Everett would witness McLee weighing out the drugs and/or standing guard over the process with a handgun tucked in the waistband of his pants. On one occasion, Everett and Turner met at a designated location and it was Murph-Jackson, unaccompanied by McLee, who showed up to deliver the kilogram of cocaine Everett had ordered.

In an event not directly related to the drug conspiracy, on May 19, 1998, Officer Ramirez of the Chicago Police Department was dispatched to a location on the south side of the city in response to a complaint of a man wielding a handgun. When the officer arrived on the scene, he saw

about ten men congregated together on the sidewalk. One of the men, later identified as McLee, held what the officer described as a .45-caliber, blue steel handgun in his hand. When McLee saw the squad car approaching, he put the gun into the waistband of his pants and fled through a series of residential backyards. McLee was the only one of the group to flee upon seeing the police.

Officer Ramirez drove around the block and caught up with McLee less than a minute after he had fled. The officer ordered McLee to the ground and searched him but did not find a gun. After McLee had been handcuffed and transferred to the custody of another officer, Ramirez searched the path by which McLee had fled and discovered a loaded .45 handgun lying in the grass in one of the yards McLee had crossed during his flight. At the time of this incident, McLee was a convicted felon. Turner testified that he had been with McLee earlier that same day and McLee was carrying a black gun with a brown handle that Turner had given to him. Turner testified that McLee "often" carried a firearm on drug transactions "to secure himself and secure me."

At some point during 2001, Murph-Jackson and McLee separated and McLee moved out of the couple's home in the Chicago suburb of Calumet City, leaving Murph-Jackson and her children as the only regular daily residents of the home. In the summer of 2001, a confidential informant identified Kevin Turner as a drug trafficker to agents employed by the Drug Enforcement Administration ("DEA"). Using information provided by the informant, the DEA made three controlled cocaine buys from Turner in 2001.

Agents then applied for and received court authorization to wiretap two telephones used primarily by Turner. A total of 1,800 calls were subsequently intercepted, and 51 of those calls were presented to the jury at trial, both

in transcribed and audio forms. DEA Special Agent Wise testified that the intercepted telephone calls were monitored by DEA agents and simultaneously recorded onto magneto-optical disks located at the DEA offices in downtown Chicago. When the period of wiretap authorization expired, the disks were placed into an evidence bag, sealed, and delivered to the Chief Judge of the District Court for the Northern District of Illinois.

Law enforcement authorities brought an end to Kevin Turner's drug-dealing enterprise on February 21, 2002. On that day a Chicago police officer working with the DEA in the ongoing investigation was detailed to a team maintaining surveillance of McLee. The officer watched McLee leave a tavern and enter a waiting vehicle driven by Murph-Jackson. The officer then followed that vehicle for several blocks until it parked on a city street for a rendezvous with three men in another car. The officer observed McLee get out of Murph-Jackson's car and hand a plastic bag to the driver of the second vehicle. McLee then returned to his wife's car and they left the scene. Another officer in the surveillance team followed the second car as it, too, left the area; a third officer in a marked squad car was eventually instructed to pull the second car over. The driver was identified as Juan Martinez. Martinez consented to a search and police recovered the plastic bag that had been transferred by McLee. It contained $47,060 in cash. Turner later identified Martinez as his principal supplier of cocaine during the latter stages of the conspiracy.

Officers were then dispatched to Murph-Jackson's Calumet City residence and waited there until she arrived home. Murph-Jackson consented to a search of the home. In the attic officers found a blue, plastic storage box containing 37 one-kilogram "bricks" of cocaine and a loaded 9mm Beretta handgun. Officers also recovered approximately 3 kilograms of cocaine and 403 grams of crack from Murph-Jackson's bedroom. At trial Turner testified that he and

McLee had delivered the blue storage container to the Calumet City home earlier in the month. Murph-Jackson's fifteen-year-old daughter, however, offered conflicting testimony on this point; she said that Turner, unaccompanied by McLee, brought the blue storage box to the home.

McLee was charged with conspiracy to deliver cocaine and crack, possession of cocaine and crack with intent to deliver, possession of a firearm in furtherance of a drug-trafficking crime, use of a telephone to facilitate a narcotics offense, and felon in possession of a firearm, contrary to 21 U.S.C. §§ 846, 841(a)(1), 843(b), and 18 U.S.C. §§ 924(c)(1), 922(g). Murph-Jackson was charged with the three drug crimes and the drug-related firearms offense. McLee was convicted by a jury on all counts. Murph-Jackson was convicted of the drug charges but acquitted on the § 924(c) drug-related firearms offense. McLee was sentenced to a total of 322 months in prison, and Murph-Jackson received a sentence of 262 months.

## II. Discussion

### A. Gun Possession in Furtherance of a Drug Crime

The jury found McLee guilty of possession of a firearm in furtherance of a drug-trafficking offense, contrary to 18 U.S.C. § 924(c)(1) and (2). The gun in question was the 9mm Beretta found with the cocaine in the blue storage box in the attic of Murph-Jackson's home. McLee argues there was insufficient evidence to prove possession because he was not living in the home at the time of the search and there was no evidence that he ever had actual physical possession of the gun.

A challenge to the sufficiency of the evidence carries a "daunting" burden. *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004). The evidence is viewed in the light most favorable to the prosecution, and the verdict must be upheld

if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 804-05. We will overturn a conviction based upon insufficient evidence "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003).

McLee is correct that the government presented no evidence that he ever possessed the Beretta on his person or that he was living in Murph-Jackson's Calumet City home at the time the gun was found. But neither of these facts was necessary to a conviction on this count. Constructive possession may be established through evidence demonstrating that the defendant had the power and intention to exercise dominion and control over the firearm, either directly or through others. *United States v. Walls*, 225 F.3d 858, 864 (7th Cir. 2000); *United States v. Thomas*, 321 F.3d 627, 636 (7th Cir. 2003). If there was sufficient evidence from which the jury could conclude that McLee had the intent to exercise dominion and control over the gun, it makes no difference that McLee was no longer living in the home and no one testified to seeing him with the gun.

Viewed in the light most favorable to the verdict, the pertinent evidence adduced at trial established that McLee and Murph-Jackson played prominent roles in the Turner drug conspiracy, storing cocaine purchased by Turner, packaging it, delivering the drugs to customers, and collecting large sums of money. The evidence further established that McLee often carried a gun in the course of carrying out these duties as a member of the conspiracy. The Beretta was found in the storage box with 37 kilograms of cocaine in the attic of the home where much of this activity was taking place. McLee, together with Turner, had delivered the storage box to the resi-

dence before its eventual discovery by police.[1] Testimony also established that although McLee and Murph-Jackson were separated at the time the gun was seized, McLee was often observed by surveillance officers coming and going from the Calumet City home during the pertinent time frame—including earlier in the day on which the search was performed.

A reasonable jury could infer from this evidence that the gun belonged to or was controlled by either McLee or Turner. Either inference provides a sufficient basis for McLee's conviction. If the jury concluded that the gun was McLee's, or under his control, the government had directly proven his constructive possession of the weapon. If the jury alternatively concluded that the gun belonged to Turner, or was under his control, McLee's conviction is sustainable under the *Pinkerton* doctrine,[2] pursuant to which a defendant may be found guilty of violating § 924(c) if a coconspirator possessed a gun in furtherance of the drug conspiracy and it was reasonably foreseeable to the defendant that his accomplice would do so. *See United States v. Chairez*, 33 F.3d 823, 826-27 (7th Cir. 1994) ("If the government proved beyond a reasonable doubt that [the defendant] was a member of a conspiracy at the time that it was reasonably foreseeable that a member of a conspiracy used or carried the firearm in furtherance of the conspiracy, then [the defendant] might be found guilty of violating § 924(c)."); *see also United States v. Goines*, 988 F.2d 750, 774 (7th Cir. 1993); *United States v. Carson*, 9 F.3d 576, 591

---

[1] Drawing inferences in favor of the verdict, and not second-guessing the jury's credibility determinations, we can only assume that the jury credited Turner's testimony that he and McLee delivered the box together, rather than the testimony of McLee's stepdaughter that Turner delivered the box alone.

[2] The doctrine takes its name and derives its authority from *Pinkerton v. United States*, 328 U.S. 640 (1946).

(7th Cir. 1993). The jury was instructed as to McLee's potential *Pinkerton* liability with respect to this count of the indictment. We conclude that the evidence was sufficient to sustain McLee's conviction for violating § 924(c).

## B. Felon in Possession of a Firearm

McLee's conviction for being a felon in possession of a firearm involves a different gun—the one Officer Ramirez saw in McLee's hands on May 19, 1998, and which he recovered from a yard McLee traversed during the ensuing foot chase. McLee challenges the sufficiency of the evidence on this count, arguing that nothing connected him to the specific gun recovered by Officer Ramirez.[3] McLee relies solely on a perceived discrepancy between the characteristics of the firearm described and found by the officer and Turner's description of the gun he saw in McLee's possession earlier on the same day.

Turner testified that he was with McLee on the day in question and saw McLee in possession of a "black gun with a brown handle." The gun recovered by Officer Ramirez and shown to the jury was described by Ramirez as being made of "blue steel." This discrepancy is not enough to disturb the jury's verdict. Evidence is not reweighed on appeal. *United States v. Bowman*, 353 F.3d 546, 552 (7th Cir. 2003). Resolution of this sort of evidentiary inconsistency is exclusively for the jury. Even if we indulge the assumption that Turner's recollection was accurate on this specific point, there is absolutely nothing preventing a rational fact finder from concluding that McLee had his hands on *two*

---

[3]   Unlike the § 924(c) charge discussed above, a felon in possession charge pursuant to § 922(g) may not be proven by way of the *Pinkerton* doctrine of vicarious coconspirator liability. *United States v. Walls*, 225 F.3d 858, 864-66 (7th Cir. 2000).

guns on the day in question, given the testimony that McLee regularly armed himself in connection with his role in the drug conspiracy.

More important is the sufficiency of Officer Ramirez's testimony that he observed McLee with a .45-caliber pistol in his hand, saw McLee stick the gun in his pants and run, observed the route by which McLee was attempting to flee, and within minutes of McLee's arrest found a .45-caliber handgun along the very same route McLee had traveled. This evidence is sufficient to sustain McLee's conviction for being a felon in possession of a firearm.

## C. Evidence of Preconspiracy Criminal Conduct

The indictment concerned itself with the drug-trafficking enterprise that Kevin Turner initiated upon his release from federal prison in 1996.[4] The activity that had originally landed Turner in prison was, itself, a drug-trafficking operation. Over the defendants' objection, the district court permitted Turner to offer limited testimony that McLee had assisted him in drug-dealing activity that predated the time frame alleged in the indictment.[5] Specifically, as a prelude to his testimony concerning the conspiracy charged in the indictment, Turner testified that he originally started selling cocaine in 1988, and that McLee—his friend since childhood—had assisted him by "brokering transactions," "going to get customers," and delivering money during the period 1988-1990.

---

[4] Count One of the indictment charged that the conspiracy lasted from "in or about 1996, until on or about February 21, 2002."

[5] McLee also complains about the admission of preconspiracy testimony offered by witnesses other than Turner, but our review of the record reveals that only Turner testified to any activity by McLee that occurred prior to 1996.

Immediately prior to this line of questioning, the court instructed the jury as follows: "I will instruct the jury that this is prior to the period charged in the indictment. But you may consider it as background information. And its relevance has to do with the relationship of the parties, but it is not directly relevant to the charges in this case." The court also included the following instruction in its closing instructions to the jury: "You have heard evidence of acts of . . . Rodney McLee other than those charged in the indictment. You may consider this evidence only on the question of the relationship of the participants. You should consider this evidence only for this limited purpose."

McLee argues that the admission of Turner's testimony was erroneous because it was not "inextricably intertwined" with the charged offense and thus should have been excluded as impermissible "other crimes" character evidence pursuant to FED. R. EVID. 404(b).[6] The district court did not abuse its discretion in admitting this testimony. *United States v. Hite*, 364 F.3d 874, 881 (7th Cir. 2004) (evidentiary rulings are reviewed for abuse of discretion). Evidence of uncharged criminal activity does not implicate the character/propensity prohibition of Rule 404(b) if the evidence is "intricately related" to the facts and circumstances of the charged offense. *United States v. Gougis*, Nos. 04-1345, 04-1508 & 04-1535, 2005 WL 3534195 (7th Cir. Dec. 27, 2005); *United States v. Lahey*, 55 F.3d 1289, 1295 (7th Cir. 1995); *United States v. King*, 126 F.3d 987, 995 (7th Cir. 1997). Evidence falls within this doctrine—also referred to as the "inextricably intertwined" doctrine—if it helps to complete

---

[6] FED. R. EVID. 404(b) provides in pertinent part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

the story of the crime on trial, if its absence would create a chronological or conceptual void in the story of the crime, or if it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove an element of the charged crime. *Gougis*, 2005 WL 3534195, at \*5; *Hite*, 364 F.3d at 881; *United States v. Ojomo*, 332 F.3d 485, 489 (7th Cir. 2003); *United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002).

Here, Turner's testimony helped to complete the story of how the conspiracy between Turner and McLee began and filled what would otherwise have been a chronological and conceptual void in the jury's understanding of the genesis and nature of their relationship. The evidence explained why Turner anointed McLee as the most trusted member of his inner circle almost immediately upon being released from federal prison and reentering the drug trade. The court's limiting instructions, both before the jury heard this testimony and at the close of the case, properly circumscribed the purpose for which the evidence was admitted. Admission of this evidence was not error.

### D.  Admission of Hearsay from Nonconspirators

McLee and Murph-Jackson argue that the district court erred in admitting testimony under the exception to the hearsay rule for statements made by coconspirators. FED. R. EVID. 801(d)(2)(E).[7] This argument is woefully undeveloped. McLee cites numerous pages of the trial transcript and then baldly asserts that somewhere on these pages we may find hearsay that either predates the conspiracy or that came

---

[7]  The entirety of the argument section of Murph-Jackson's brief states: "All issues raised and arguments presented in his brief by co-defendant, Rodney McLee, applicable to this co-defendant, Vicki Murph-Jackson are hereby adopted."

from witnesses who were not coconspirators. He makes no attempt to identify the particular statements he would like to put at issue or how any particular statement was prejudicial to his defense. He wraps up his one-page argument by acknowledging that standing alone, admission of this supposed hearsay was harmless, but that when viewed in combination with Turner's preconspiracy testimony discussed above, the hearsay created "a false image about the amount of drugs McLee was involved in."

The weakness of this argument is difficult to overstate. First, "it is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003). In any event, our cursory examination of the transcript pages cited by McLee reveals that on none of these pages is any witness testifying about either McLee or Murph-Jackson. Nor was there any objection, leaving only plain error review. We decline to undertake that analysis on so undeveloped an argument.

## E. Limitation on Cross-Examination

One of those originally charged in the indictment was Prince Turner, Sr., father of Kevin and Prince Turner, Jr. Approximately five weeks prior to trial, the government dropped all charges against Prince Turner, Sr. Two weeks later, the government moved in limine to preclude the defendants from "making any arguments based on the government's decisions not to charge other individuals who conceivably could have been charged and to dismiss the indictment as to Prince Turner, Sr." The defendants apparently did not respond to this motion. Based on events that transpired during the trial, it appears that the motion was granted, although the parties have not provided us with any record of the court's ruling. During cross-examina-

tion of Prince Turner, Jr.—who, like his brother Kevin, pleaded guilty and testified pursuant to a plea agreement—the district judge made the following statement at a sidebar conference:

> And I want to make it plain now to everybody if there is any mention before this jury about his father's charges and later dismissal, I will hold that lawyer in contempt. That is off limits based on a pretrial ruling. We are not going to deviate from that. And these questions do not elicit any additional probative value as to his motive and bias and court the danger that we are going to get into his father's case. It is entirely proper to ask, as has been asked by counsel, about his father's participation and did he do this and do that. There is nothing wrong with that. But the charges that were dismissed are decisions by the U.S. Attorney's office and do not add anything to this case and are not properly before this jury.

McLee and Murph-Jackson argue on appeal that the district court inhibited their right to confront the witnesses against them about a possible motivation for their testimony—specifically, they suggest that Kevin and Prince Turner, Jr., agreed to plead guilty and testify in exchange for the dismissal of charges against their father. The government responds that the charges against Prince Turner, Sr., were dismissed before the Turner brothers decided to plead guilty and cooperate with the prosecution, and there is not a shred of evidence from which to infer any connection between the dismissal of the charges and their agreement to testify.

The Sixth Amendment guarantees a defendant the right to cross-examine witnesses, and "the exposure of a witness' motivation in testifying is an important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986).

However, the right of cross-examination is not unfettered, and trial judges have broad discretion to impose reasonable limits on cross-examination based on concerns about "harassment, prejudice, confusion of the issues, the witnesses' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Cameron*, 814 F.2d 403, 406 (7th Cir. 1987) (quoting *Van Arsdall*, 475 U.S. at 679). Moreover, we have held that once a witness has been exposed through cross-examination as having a motive to lie, a district court enjoys greater freedom to limit cross-examination that merely seeks to add additional layers of motivation to those already established:

> [O]nce this core function [of the Sixth Amendment] is satisfied by allowing cross-examination to expose a motive to lie, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury. The trial court may preclude "cumulative and confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability."

> . . . .

> "When reviewing the adequacy of a cross-examination, the question is whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias."

*United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (quoting *United States v. Robinson*, 832 F.2d 366, 373 (7th Cir. 1987) and *United States v. DeGudino*, 722 F.2d 1351, 1354 (7th Cir. 1983)).

Here, there was no shortage of cross-examination exposing the Turner brothers' motive to lie. The jury heard exhaustive detail about the brothers' plea agreements and knew that those plea bargains could have influenced them to testify for the prosecution in an effort to obtain more

favorable sentencing recommendations. Kevin Turner was
questioned about his agreement to plead guilty and testify
in order to avoid a possible life sentence. The defense was
permitted great leeway to ask, repeatedly and in various
ways, whether Turner would "do anything"—including give
false testimony—to avoid the possibility of life in prison.
The same testimony was elicited from Prince Turner,
Jr.—that he struck a deal to testify as a means of eliminat-
ing the possibility of life imprisonment. The jury had more
than enough information to make a "discriminating ap-
praisal" of the Turner brothers' motives for testifying
against McLee and Murph-Jackson.

   Given that the possible biases of Kevin and Prince
Turner, Jr., were exposed and explored, the district court
was within its discretion to exclude evidence of the
U.S. Attorney's charging decisions regarding their father.
There is no evidence suggesting a link between the dis-
missal of the charges against the father and the plea
agreements of the sons; any inference of bias on this basis
would have been entirely speculative. If the defense had
been permitted to invite such speculation by the jury, the
prosecution may well have felt compelled to present evi-
dence explaining its decision to dismiss the charges against
Prince Turner, Sr.—a potentially misleading diversion the
district court justifiably chose to avoid.

## F.  Necessity of Wiretaps

   Prior to trial, McLee and Murph-Jackson moved to
suppress the evidence obtained from wiretaps on Kevin
Turner's telephones on the ground that the govern-
ment failed to show, when applying for judicial authoriza-
tion to conduct the surveillance, that the wiretaps were
"necessary" pursuant to 18 U.S.C. § 2518(1)(c). Specifically,
the defendants argued that the government had amassed
"more than enough" evidence to indict them prior to

obtaining the wiretap order, thus rendering the wiretap unnecessary to the prosecution. The motion was denied and they challenge the denial on appeal.

The statute in question provides a checklist of information that must be included in an application for an order authorizing the interception of telephonic communications. Subsection (1)(c) requires: "[A] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[8]

This section of the statute was *not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are "not to be routinely employed as the initial step" in a criminal investigation. *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). The rule in this circuit is that the government's burden of establishing compliance with § 2518(1)(c) "is not great," and that the requirement of exhausting "other investigative procedures" prior to obtaining a wiretap is "reviewed in a practical and common-sense fashion." *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995); *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988); *United States v. Anderson*, 542 F.2d 428, 430 (7th Cir. 1976). To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means. *Plescia*,

---

[8] The statute goes on to state that a judge may enter an ex parte order authorizing the interception of wire, oral, or electronic communications if he or she finds, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

48 F.3d at 1463. We have upheld the "necessity" of wiretap orders on the basis that investigators were "having trouble fingering other members of the conspiracy," *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991), and that the wiretaps "allowed the government to ascertain the extent and structure of the conspiracy." *Plescia*, 48 F.3d at 1463. A finding of necessity is reviewed for abuse of discretion, with great deference given to the determination made by the issuing judge. *Zambrana*, 841 F.2d at 1329-30.

The affidavit supporting the issuance of the wiretap order in this case stated that traditional investigative techniques had met with "some success" but that tapping Turner's telephones had become necessary because investigators had been unable, through the use of traditional techniques, to establish the identities of all those participating in the conspiracy. The truth of this assertion was borne out by subsequent events—the identity of Juan Martinez, Turner's primary supplier of cocaine and an indicted coconspirator, was learned only through the intercepted telephone communications. Further, the record demonstrates that the roles played by Murph-Jackson and Steve Brown in the conspiracy were revealed to investigators only after they listened in on Turner's telephone calls. Despite McLee's assertion to the contrary, the fact that the government may have been able to indict him in the absence of evidence obtained through the use of a wiretap does not preclude a finding of necessity under § 2518(1)(c). The government's demonstrated need for a wiretap as a means of identifying all coconspirators and the roles they occupied in the structure of the conspiracy is sufficient for a finding of "necessity" under the statute.

## G. Admissibility of Wiretap Evidence

In another pretrial motion, McLee and Murph-Jackson sought to suppress the evidence obtained through the taps

on Turner's telephones on the basis that the government failed to seal the original recordings of the intercepted calls, which they claim is required by 18 U.S.C. § 2518(8)(a). The motion was denied by the district court and the argument is renewed on appeal.

The statute on which the defendants' argument is premised provides as follows:

> The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.
>
> . . . .
>
> Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations.

18 U.S.C. § 2518(8)(a). McLee and Murph-Jackson contend that this statute requires the government to present the district court with the "original" recordings for sealing and that the recordings that were sealed in this case run afoul of the statutory requirements because they were not the "originals."

The record reflects that the intercepted phone calls in this case were processed in the following manner: Telephone calls being monitored by the DEA's Chicago office—from all ongoing wiretap investigations, not just this one—are initially directed to a single computer hard drive located in that office. This hard drive, according to the government's

terminology, is a "buffer" or "temporary holding site" for all intercepted communications. Although the storage capacity of the hard drive buffer is "relatively large and thus typically would not fill to capacity," the system is designed to overwrite previously stored audio with new audio in the event the drive becomes filled to capacity.

When a telephone call enters this system, the buffer: 1) stores the actual audio of the telephone call in an encoded form; 2) generates "session data" comprised of a session number, date, start time, and end time; and 3) generates "pointers" for the call, described by the government as "a decoding map that the system can later use to decode the encoded audio portion on the hard drive buffer." The hard drive buffer initially stores the session data and pointers separately from the audio but then merges the three pieces of information by automatically writing from the buffer onto a magneto-optical disk. The information on the disk is thus comprised of the encoded audio, session data, and the pointers necessary to decode the audio. There is no "editing or alteration function" in this system.

The magneto-optical disks relevant to the wiretap order in this investigation were presented to the district court for sealing pursuant to the statute. McLee and Murph-Jackson argue that § 2518(8)(a) required the government to deliver the hard drive buffer to the court for sealing because the buffer is the true "original recording" of the intercepted call.

The primary purposes of § 2518(8)(a) are to "ensure the reliability and integrity of evidence obtained by means of electronic surveillance" and "limit[ ] the Government's opportunity to alter the recordings." *United States v. Ojeda-Rios*, 495 U.S. 257, 263 (1990). As applicable to this case, the statute requires that intercepted communications be recorded "on tape or wire or other comparable device" in such a way "as will protect the recording from editing or other alterations," and that "such recordings" be made

available to the judge issuing the surveillance order and sealed under his direction. Despite the strenuous efforts of McLee and Murph-Jackson to convince us otherwise, the word "original" appears nowhere in the statute. Moreover, their argument ignores every detail of the procedure used by the government for recording the intercepted calls.

McLee argues that "anyone familiar with computers knows that a computer hard drive leaves lasting records that can allow a technician to decipher any alterations or tampering" and "anyone with editing software and a CD burner knows that alteration of a CD's content can be done seamlessly and with little or no trail of alteration." McLee presented no evidence to this effect in the district court, and these suppositions conflict with the record evidence regarding the sophisticated capture and preservation system used by the government. This unsupported attempt to equate the government's wiretap recording system with the functions commonly used on home computers is unpersuasive. In the complete absence of any countervailing evidence, we must accept the accuracy of the government's description of the attributes of its computer system, including the absence of any editing or alteration function.

McLee and Murph-Jackson assert that because the intercepted calls are routed to the buffer prior to being written onto the magneto-optical disk, it is the *buffer*, and not the *disk*, that constitutes the "device" on which the communications are recorded and must be sealed pursuant to § 2518(8)(a).[9] This argument ignores the fact that the buffer is a temporary holding site for the audio portion of the call and generates the "session data" and the "pointers" that identify and decode the encoded audio. The magneto-

---

[9] The defendants do not argue that the sealed disks contained recordings that differed in any way from the data that was initially stored on the hard drive buffer.

optical disk is therefore the first storage medium from which a comprehensible call can be replayed to a listener. In other words, even if it were possible for the hard drive buffer to be removed from the system and sealed by the court (a topic on which the parties do not comment), it is not apparent that the object being sealed would be capable of reproducing any recognizable human voices without transfer to another medium.

Finally, the fact that the government's interception system is designed to overwrite existing audio from the buffer in the event it fills to capacity makes it clear that the disk, not the buffer, is the secure storage medium for intercepted recordings that must be submitted for sealing under § 2518(8)(a). The motion to suppress the wiretap evidence was properly denied.

## H.  Drug Quantity Determination

McLee argues that the district court committed clear error when it found, for purposes of sentencing, that he was responsible for more than 150 kilograms of cocaine and 1.5 kilograms of crack.[10] Post-*Booker*, the clear error standard of review continues to apply to factual findings made by the district court for purposes of determining the applicable advisory sentencing guidelines range. *United States v. Julian*, 427 F.3d 471, 489 (7th Cir. 2005). In a drug conspiracy each conspirator is responsible not only for drug

---

[10] With respect to this issue, Murph-Jackson's brief once again states only that she "adopts" the arguments made by McLee to the extent that they apply to her. The trouble here is that McLee makes no arguments applicable to Murph-Jackson, and he argues only that the evidence against *him* was insufficient to sustain the court's drug quantity attribution. Murph-Jackson has therefore not properly raised any argument on appeal with respect to factual findings made in the course of sentencing.

quantities directly attributable to him but also for amounts involved in transactions by coconspirators that were reasonably foreseeable to him. *United States v. Paters*, 16 F.3d 188, 191 (7th Cir. 1994).

McLee's attack on the district judge's factual findings is specious. The judge presided over a two-week trial in which no fewer than four members of the conspiracy and one major purchaser of cocaine testified at length regarding McLee's complete and total immersion in all aspects of a drug-trafficking operation that purchased and distributed between 10 and 50 kilograms of cocaine a month for a period of approximately six years. According to Kevin Turner, McLee was "involved in every drug trans-action," either in the capacity of delivering drugs, storing drugs, packaging drugs, collecting money from customers, delivering money to Turner, or acting as Turner's body-guard. Other testimony established McLee as the bag man for the $47,060 delivery to the conspiracy's cocaine supplier and as a participant in the delivery of the 37 kilograms of cocaine discovered in Murph-Jackson's attic, the final transactions before the conspiracy was interrupted by arrests.

With respect to the crack amounts, Turner and Steve Brown, another member of the conspiracy, testified that Brown would purchase an eighth or a quarter kilogram of cocaine per week from Turner, often delivered to Brown by McLee, and cook the cocaine into crack. Brown testified that in the first half of 2001 he began purchasing his cocaine directly from McLee in quantities of a half ounce to an ounce at a time. Turner also testified that he recalled six or seven occasions in 1998 when he was present and witnessed McLee cooking an eighth of a kilogram of cocaine into crack. The evidence also established the seizure of 400 grams of crack from Murph-Jackson's home.

At sentencing the district court found that McLee "was so intricately related to the conspiracy and to the main

conspirator, if you will, that it would be unreasonable not to saddle him or charge him with the drugs that the evidence suggested this conspiracy was responsible for." This was not clear error.

## I. Mandatory Guidelines Application

McLee and Murph-Jackson were sentenced under the now unconstitutional mandatory sentencing guidelines system. *Booker*, 543 U.S. 220. In supplemental briefing McLee requested resentencing; Murph-Jackson did not file a supplemental brief after the Supreme Court's decision in *Booker*. Neither preserved the issue in the district court, so review is for plain error. *Paladino*, 401 F.3d at 481. Whether the error is plain in this context depends on whether the district court would have imposed a more lenient sentence had the court not believed it was bound by the guidelines. *Id.* at 483. Where the record is unclear on this point, we retain jurisdiction and remand for a statement of the district court's views. *Id.* at 484.

The sentences imposed in this case were at the low end of very high guidelines ranges, and the judge made several comments at sentencing explaining that he was inhibited by the sentencing guidelines from imposing lesser sentences. Regarding Murph-Jackson, the judge said: "I just tell the family members of Ms. Murph-Jackson that whatever my thoughts [on sentencing] would be, if we had a different sentencing scheme or structure, do not really matter because I am bound to the guidelines. And there is nothing I can do to change that." Regarding both defendants, he said: "I do not have a free hand, as I told everyone here, and especially his family, in either Rodney's case or Vicki's case. I have virtually no hand at all, if you want to know the truth." The court also characterized the sentences imposed as being very long, and stated, with respect to McLee, "I do not even pretend I am being merciful by giving

the low end of the guideline range." Although Murph-Jackson did not specifically request resentencing in light of *Booker*, we will order a limited remand pursuant to *Paladino* for both defendants. *See United States v. Murphy*, 406 F.3d 857, 862 (7th Cir. 2005).

The defendants' convictions are AFFIRMED. We retain jurisdiction and order a limited REMAND in accordance with the procedure outlined in *Paladino*.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*
