THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY STROUD, Defendant-Appellant.

First District (4th Division) No. 1—05—0683

Opinion filed June 30, 2009.

Allan A. Ackerman, P.C., of Chicago (Allan A. Ackerman, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Kathleen Warnick, and Rimas F. Cernius, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NEVILLE delivered the opinion of the court:

On September 30, 1998, codefendants Gregory Stroud (Stroud),[1] Carmecita Williams, Sean Stroud, and Dwight Chandler were charged with, among other things, violating the criminal drug conspiracy statute. 720 ILCS 570/405.1 (West 1998). The trial court conducted a joint bench trial and, at its conclusion, granted Sean Stroud's and Chandler's motions for directed verdict. Williams' appeal is currently pending before this court, but we vacated the order consolidating the Stroud and Williams cases. Therefore, Stroud is the only defendant involved in this appeal.

Stroud was convicted of criminal drug conspiracy, five counts of delivery of more than 100 but less than 400 grams of cocaine, one count of possession of more than 900 grams of cocaine with intent to deliver, and one count of possession of 1 to 15 grams of cocaine with intent to deliver. He was sentenced to concurrent 20 year terms in prison.

On appeal, Stroud presents five issues for review: (1) whether Public Act 85—1203 (Pub. Act 85—1203, eff. January 1, 1989) and Public Act 86—763 (Pub. Act 86—763, eff. September 1, 1989), which amended Article 108B of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/108B (West 1998)), violate the single subject clause in the Illinois Constitution (Ill. Const. 1970, art. IV, §8(d)); (2) whether his convictions must be reversed because (a) the State failed to satisfy the "necessity" component for the issuance and subsequent extension of two electronic surveillance orders, and (b) the State used an improper methodology in identifying Stroud's voice; (3) whether the trial court erred when it found that section 405.1 of the Illinois Controlled Substances Act (720 ILCS 570/405.1 (West 1998)) was not void because Public Act 89—404 (Pub. Act 89—404, eff. August 20, 1995) violates the single subject clause; (4) whether the State presented sufficient evidence to convict him of criminal drug conspiracy (720 ILCS 570/405.1 (West 1998)); and (5) whether the trial court erred when it denied his motion to suppress the seized

---

[1]The indictment for criminal drug conspiracy alleged that Gregory Stroud was also known as Greg Hollins, Greg Cash, Jerry Hollins, and Gowin.

physical evidence based on a warrantless traffic stop. In a petition for rehearing, the defendant maintains that the trial court erroneously convicted and sentenced him for possession with intent to deliver cocaine (the principal offense) and for criminal drug conspiracy (the inchoate offense). For the reasons that follow, we vacate the defendant's conviction and sentence for criminal drug conspiracy, affirm his remaining convictions and sentences for possession with intent to deliver, and direct the clerk to correct the mittimus.

## BACKGROUND

The instant case involves an undercover investigation into a suspected drug ring. On September 30, 1998, a Cook County grand jury returned a true bill charging Stroud with one count of criminal drug conspiracy, with five counts of delivery of more than 100 but less than 400 grams of cocaine, with one count of possession of more than 900 grams of cocaine with intent to deliver, with one count of possession of one to 15 grams of cocaine with intent to deliver, with one count of possession of less than 10 grams of heroin with intent to deliver, and with two counts of unlawful use of a firearm by a felon.

### Pretrial Proceedings

Prior to trial, Stroud filed a motion to suppress the intercepted communications and argued that Public Act 85—1203 (Pub. Act 85—1203, eff. January 1, 1989) and Public Act 86—763 (Pub. Act 86—763, eff. September 1, 1989) violated the single subject clause because the acts addressed subjects other than electronic surveillance. Judge Himel conducted a hearing on the matter and denied the motion. Stroud also filed a pretrial motion to suppress the physical evidence seized in a warrantless traffic stop, which the trial court deferred ruling on until evidence was presented at trial.

After the case was transferred from Judge Himel to Judge Darcy, Stroud filed a second motion to suppress the intercepted communications. Again, he argued that Public Acts 85—1203 and 86—763 violated the single subject clause because the acts addressed subjects other than electronic surveillance. He also argued that the affidavits in support of, and the authorizations for, the electronic surveillance orders were fundamentally flawed. The trial court denied the motion.

Stroud also filed a motion to strike voice identification testimony and argued that the court must strike Investigator Macklin's testimony regarding the identification of Stroud's voice because Macklin violated Article 108B by playing the tapes to Stroud.

### The Trial

The State's main witness was Investigator Maurice Macklin. Throughout the trial, the State played tape-recorded conversations

between Macklin and Sam Elem[2], a drug dealer, as well as surveillance videotapes of their interactions. The State also played tape-recorded conversations that had been intercepted pursuant to the electronic surveillance orders. After the State played the tapes at trial, Macklin explained what had occurred in the tapes.

## The State's Case

At trial, Macklin testified that he is an investigator with the Cook County State's Attorney's office and is assigned to long-term narcotics investigations. On February 6, 1998, he went undercover and portrayed himself as a person interested in buying large quantities of cocaine. A confidential informant introduced him to Elem. Elem said he could sell Macklin various quantities of cocaine and explained the corresponding prices. Later that day, Macklin appeared before Judge Linn and requested a consensual overhear order, which Macklin explained was a body wire to record future communications with Elem. Judge Linn granted a 10-day consensual overhear order.[3]

The State played recorded telephone conversations that occurred on February 7, 1998. Macklin and Elem discussed the purchase price of an eighth of a kilogram of cocaine, and they agreed to meet at a parking lot. Elem drove up to Macklin's undercover vehicle and Macklin asked about the price of the cocaine. Elem responded that he would have to "run to the house" and find out the price. Elem used a gas station pay phone and, when he returned, told Macklin that he had to go down the street to get the price of cocaine. Macklin waited at a fruit stand, but Elem never returned because he was arrested by the South Holland police for reasons unrelated to the instant investigation.

The State played recorded telephone conversations that occurred on February 14, 1998. Elem told Macklin that he needed to contact his cocaine supplier and they agreed to meet at the fruit stand. Macklin went to the fruit stand with $5,000 in prerecorded funds. When Elem arrived, Macklin informed Elem that he normally buys an eighth of a kilogram of cocaine, although he sometimes buys a "loaf," referring to a kilogram of cocaine. Elem said he, referring to his supplier, would give Macklin a good price once Macklin bought cocaine on a regular

---

[2]Elem also appears in the record as "Elam," and we will use the "Elem" spelling of his name in this opinion.

[3]The consensual overhear applications and orders for eavesdropping devices worn on the person are not included in the appellate record as required by Supreme Court Rule 608(a)(6). See 210 Ill. 2d R. 608(a)(6) (the record on appeal must contain, among other things, eavesdropping orders and other similar documents).

basis. Elem then drove out of the fruit stand parking lot. According to Macklin, when Elem returned, Elem entered Macklin's vehicle and told Macklin that the price for an eighth of a kilogram of cocaine was $3,200. Macklin told Elem he normally conducts his transactions hand-to-hand, but Elem explained that his supplier always does business this way and that Elem is not allowed to take anyone to his supplier's house. Macklin gave Elem $3,200 for an eighth of a kilogram of cocaine. According to Macklin, Elem got into Macklin's vehicle carrying a brown paper bag and gave Macklin an eighth of a kilogram of cocaine. The parties stipulated that the package Elem gave Macklin contained 124.4 grams of cocaine.

Officer Manuel Colon testified that he conducted the surveillance on February 14, 1998, and saw Elem drive to 15617 South State Street, exit the vehicle, walk toward the residence, exit the residence, get into his vehicle and drive to the fruit stand. Colon later saw Elem drive away from the fruit stand, drive to 15617 South State Street, enter and exit the residence, and drive back to the fruit stand. Officer Lau's testimony corroborated Officer Colon's testimony, except Officer Lau also testified that Elem was carrying a black bag.

On February 18, 1998, Macklin appeared before Judge Lampkin and obtained another 10-day consensual overhear order.

The State played recorded telephone conversations that occurred on February 19, 1998. Macklin asked Elem if he could get another eighth of a kilogram of cocaine, and Elem indicated it should not be a problem. They agreed to meet at the fruit stand, and Macklin brought $3,500 in prerecorded funds with him. When Elem arrived, he told Macklin that he would talk to his supplier and that they should meet again later that day. Approximately half an hour later, Elem returned to the meeting location and got into Macklin's vehicle. Elem told Macklin that the price for an eighth of a kilogram of cocaine was $3,250, and Macklin gave Elem the money. Macklin testified that when Elem returned, Elem entered Macklin's car and gave him an eighth of a kilogram of cocaine. Macklin indicated to Elem that the weight of the package felt light. When Macklin returned to the police station and weighed the package, it was approximately 10 grams short of an eighth of a kilogram. The parties stipulated that the package contained 113.5 grams of cocaine.

Officer Colon testified that he was conducting surveillance on February 19, 1998, and observed Elem drive to 15617 South State Street, enter the residence, emerge from the residence, and drive to the fruit stand.

The State played another recorded telephone conversation that occurred later that afternoon. Macklin told Elem the package was short

10 grams, and Elem said he was going to call his supplier. It was stipulated that two telephone calls were made from a pay phone to Stroud's phone. Macklin testified that he received a page from the pay phone, called the number, and Elem answered the phone. In a recorded telephone conversation, Elem told Macklin that his "peoples" wanted to know how short the package was, and Macklin responded 10 grams. Two subsequent phone calls occurred from the pay phone to Stroud's phone. Macklin again received a page, he returned the page, and Elem answered. Elem told Macklin that the shortage would be made up in a subsequent deal.

On February 27, 1998, Macklin appeared before Judge Fitzgerald and obtained a 10-day consensual overhear order. On March 20, 1998, Macklin obtained another 10-day consensual overhear order from Judge Fitzgerald.

Officer Michael Jamison testified that on March 20, 1998, he and Officer Michael Cox performed a garbage pull from 15617 South State Street. At trial, Jamison identified numerous pieces of mail that were retrieved from the garbage, including: (1) a bill addressed to Greg Hollins at 15617 South State Street; (2) two documents marked "PMC" mortgage addressed to Charles and Barbara Stroud at 15617 South State Street; (3) an envelope addressed to Gregory Cash at 15617 South State Street; (4) a Great Lake Collection Bureau document addressed to Greg Hollins at 15617 South State Street; (5) a J&D landscaping statement addressed to Greg Stroud at 15617 State Street; (6) a Parkway Center envelope addressed to Greg Cash at 15617 South State Street; and (7) various other items addressed to Charles Stroud, Mrs. Stroud, Tonya Wagner, and Yahoaz Wagner. On April 10, 1998, Officers Jamison and Cox performed another garbage pull at 15617 South State Street in which they recovered a book titled, "Covert Surveillance and Electronic Penetration" and a flyer for a body wire detector coupon. During the garbage pull, they also recovered documents addressed to Jerry Hollins.

The State played recorded telephone conversations that occurred on March 31, 1998. Macklin told Elem that he wanted to buy another eighth of a kilogram of cocaine and reminded Elem to talk to his supplier about the previous shortage. They agreed that Macklin would pick Elem up at a prearranged location. Macklin picked Elem up and drove him to a gas station. Macklin had $3,500 in prerecorded funds. Elem exited the vehicle and used the gas station pay phone. When Elem returned to Macklin's vehicle, Macklin gave Elem $3,250 for an eighth of a kilogram of cocaine. They decided Macklin would drop Elem off in the area where Elem needed to go, but not in front of the location. A videotape showed Elem walking into the residence at 15617

South State Street. After Elem left the residence, Macklin picked him up. According to Macklin, Elem did not have any cocaine when he returned to the vehicle. Elem said he left the money with his supplier. Approximately an hour later, Macklin dropped Elem off south of 15617 South State Street. A videotape showed Elem walking into 15617 South State Street, emerging from the residence carrying a bag, and Macklin picking up Elem. According to Macklin, Elem gave Macklin a bag containing an eighth of a kilogram of cocaine. The parties stipulated that the package had two smaller packages, one that contained 93.6 grams of cocaine and another that contained 33 grams of cocaine.

On June 17, 1998, Cook County State's Attorney Richard Devine filed an application requesting authorization for two electronic surveillance orders. Specifically, he requested the electronic interception of two telephone numbers listed in the name of Greg Hollins and located at 15617 State Street in South Holland, Illinois. In his application, he stated that there was probable cause to believe that crimes, including the crime of criminal drug conspiracy, had been committed and that essential evidence of those crimes could be obtained by the interception of telephone communications. He further stated that "there [were] no alternative investigative procedures that could be used to acquire the essential evidence necessary to achieve all the goals of this investigation and to successfully prosecute all the perpetrators of the criminal activities." Attached to the application was an affidavit signed by Officers Jamison and Cox. The affidavit summarized the investigation as it had transpired up to that point and, among other things, explained the various investigative tools that had been used. On June 17, 1998, Judge Toomin signed the two electronic surveillance orders.

On June 23, 1998, Macklin appeared before Judge Moran and obtained another consensual overhear order.

The State played an intercepted telephone conversation from June 24, 1998. Macklin recognized one of the voices as that of Stroud, and the other speaker identified himself as Dwight. Macklin explained at trial that, on the tape, Stroud told Dwight the price for two kilograms of cocaine would be $41,000, but the price would go down if five kilograms were purchased at one time.

The State played an intercepted telephone conversation from June 27, 1998, between Elem and Stroud. After Elem and Stroud talked, Elem called Macklin. The State played the recorded telephone conversation between Elem and Macklin in which Elem told Macklin that his cocaine source was ready to pick up the package. When Macklin told Elem he was not going to be able to make a purchase that day, Elem said he still needed to visit his supplier. The State then played a

videotape from the same day in which Elem walked up to 15617 South State Street. Macklin then paged Elem and Elem returned the page. In the recorded telephone conversation played for the court, Macklin reminded Elem about the previous shortage and Elem indicated he had just left his source. Macklin told Elem he might purchase an eighth of a kilogram of cocaine the following Monday or Tuesday. The State then played an intercepted telephone conversation from later that afternoon in which Elem told Stroud that what they had been talking about would happen Monday or Tuesday. Stroud told Elem that when "it" got in Elem's hand, he should "double check everything."

The State played another telephone conversation that occurred on June 30, 1998. Macklin explained that, on the tape, he asked Elem if he could purchase another eighth of a kilogram of cocaine, and Elem said he had to check with his supplier. The State then played an intercepted telephone conversation in which Elem called Stroud and Stroud told Elem to call back in an hour. According to Macklin, he and Elem had another telephone conversation in which they agreed to meet in an hour. Macklin went to the prearranged location with $3,500 in prerecorded funds. When Elem arrived at the location, Macklin gave him $3,250 for the eighth of a kilogram of cocaine. According to Macklin, when Elem returned, Elem got into Macklin's vehicle and handed Macklin a brown plastic bag that had a clear plastic bag containing an eighth of a kilogram of cocaine. The parties stipulated that the package contained 123.9 grams of cocaine.

On July 2, 1998, Judge Toomin signed another 10-day consensual overhear order.

Macklin testified that on July 10, 1998, in a taped conversation, Macklin told Elem that he wanted to exchange the money and the kilogram of cocaine at the same time, but Elem would not agree to such an arrangement.

The State played recorded telephone conversations from July 15, 1998, in which Macklin and Elem agreed to meet at the pay phone. The State then played an intercepted telephone conversation between Stroud and Elem in which Elem asked Stroud if he could see him, and Stroud responded that he could. Macklin went to the prearranged meeting location and took $3,500 in prerecorded funds with him. When Elem arrived at their prearranged meeting location, Macklin gave him $3,250 in prerecorded funds. The State played a videotape in which Elem entered 15617 South State Street, emerged from the residence, and drove away. According to Macklin, when Elem returned to the meeting location, he gave Macklin an eighth of a kilogram of cocaine. Macklin inquired about purchasing a kilogram of cocaine for $18,000

or $19,000, and Elem responded that "he," referring to his supplier, would probably be able to do that. The parties stipulated that the package contained 123.6 grams of cocaine.

On July 17, 1998, Cook County State's Attorney Richard Devine submitted an application for an extension of the two electronic surveillance orders. Attached to the application was an affidavit signed by Officers Jamison and Cox in which they detailed the investigation, stated that normal investigative techniques had failed to achieve all of the objectives associated with the investigation, and discussed the techniques thus far employed. On July 17, 1998, Judge Toomin granted a 30-day extension of the two electronic surveillance orders. On July 27, 1998, Judge Fitzgerald granted an additional 10-day consensual overhear order.

The State played recorded telephone conversations from July 28, 1998, in which Macklin asked Elem about the price for a "loaf," or a kilogram of cocaine, and Elem said he would try to "call old boy *** right now." The State played an intercepted telephone conversation in which Elem called Stroud and asked if "that car" was going to be 17, and Stroud answered, "something like that." Elem said he wanted to get "that car" today, and Stroud told him to contact him again in 30 minutes. Macklin and Elem agreed to meet later that day so Macklin could purchase a kilogram of cocaine. The State played a videotape in which Elem drove to 15617 South State Street. According to Macklin, when Elem returned, Elem told Macklin that the source said a kilogram of cocaine would cost $21,500. Macklin said the price was too high, and no narcotics transaction occurred.

The State played an intercepted telephone conversation from July 29, 1998. When the State asked Macklin about the slang terms used by the speakers on the tape and attempted to offer Macklin as an expert witness, the defendants objected. The court allowed Macklin to testify as to his understanding of the meaning of the speakers' conversation for the limited purpose of establishing probable cause for the traffic stop.

The State played an intercepted telephone conversation from August 4, 1998. The parties stipulated that Stroud was one of the speakers, and Stroud referred to the other speaker as Dwight. Stroud told Dwight "we can roll in the morning." Dwight asked if they could do "this" tomorrow because he knew the numbers had changed. According to Macklin, Dwight was referring to the price for the cocaine. Dwight asked Stroud if he ordered from a third party "a pair of shoes," which Macklin said referred to two kilograms of cocaine. Stroud responded that he got one and was going to see if he could get the other one.

The State played a number of intercepted telephone conversations from August 5, 1998. In the first conversation, Macklin recognized the voice of the person who received the call as Stroud and the voice of the person who made the call as the same person who made the call the previous day, Dwight. Dwight said he needed "two" that morning. Later that morning in another intercepted telephone conversation, Dwight reminded Stroud about the "pair of shoes." Later that day, in another intercepted conversation, Stroud told Dwight that his "guy" said "the morning first thing." Stroud said "it's here already" but he did not know the number. Macklin explained that Stroud was indicating he was in possession of the cocaine but still did not know the price for it.

On August 12, 2003, the defendant filed a motion to strike voice identification, which the trial court deferred ruling on.

Officer Brandon Hartford testified that on August 5, 1998, he followed a red Corvette, driven by Stroud, saw the Corvette pull into a marina and saw two people exit the vehicle. Later that evening, Stroud and the other person walked back to the Corvette and, as they were doing so, continuously looked around them. Stroud was carrying a beige-colored bag.

Officer Colon testified that on August 5, 1998, he observed Stroud drive away from the marina. Colon then drove to 15617 South State Street and set up a fixed surveillance. Later that evening, he saw Stroud drive up to the residence in a red Corvette, exit the vehicle, and look in the backseat behind the driver's seat.

The State played an intercepted telephone conversation from August 6, 1998, in which Dwight called Stroud and Stroud confirmed that Dwight wanted "twins." Later that afternoon, Stroud told Dwight to make sure that his "flight tickets" were ready because he had to give them to someone. Macklin explained that "flight tickets" represented money, and Stroud was telling Dwight to make sure his money was correct because Stroud had to take the money to another location to pay for the product. Macklin opined that, in his experience, the speakers were negotiating two kilograms of cocaine.

Officer Christopher Lappe testified that on August 6, 1998, he and his partner, Officer Mike McDonough, were assigned to stop a red Corvette driven by Stroud. Lappe testified that he believed there were two kilograms of cocaine in the vehicle based on "intercepted phone conversations and from the surveillance officers." Lappe further explained that he had been informed of some intercepted conversations involving Stroud and the transportation of two kilograms of cocaine. At approximately 3:24 p.m., the officers pulled Stroud over. The windows of the Corvette were down and the T-tops were removed.

Lappe asked Stroud for his license. Stroud gave the officer an Illinois State ID card that had Stroud's photo, but the name on the ID was Jerry Hollins and the address listed was 8242 South Hermitage. Lappe asked Stroud to step out of the vehicle, patted him down for weapons and escorted him to the rear of the vehicle, where McDonough was standing. While McDonough spoke with Stroud, Lappe returned to the Corvette.

Lappe testified that through the rear window he saw an open black tote bag containing a brown paper bag. Two taped objects were inside the bag. Upon entering the vehicle and recovering the tote bag, Lappe believed that the objects were kilograms of cocaine. Lappe removed the items from the vehicle and signaled to McDonough. Lappe and McDonough got back into their vehicle and drove away. Stroud was allowed to leave. The parties stipulated that one of the confiscated packages contained 999.8 grams of cocaine and the other contained 1,002.5 grams of cocaine. On cross-examination, Lappe testified that he did not have a search or arrest warrant and that Stroud committed no traffic violation.

In response to concerns brought forth by the defendants, the court ruled that it would not allow the State to present Macklin as an expert concerning his interpretation of the meaning of other people's conversations. Specifically, the court stated that it did not believe Macklin could testify as to what other people meant in their telephone conversations.

The State played an intercepted telephone conversation from August 6, 1998. When the State asked Macklin if he recognized the voice of the persons on the tape, Stroud objected. Stroud reminded the court that he had a standing objection regarding voice identification, and the court overruled the objection. The State played an intercepted telephone conversation from August 7, 1998, in which Stroud told Dwight he had been "stuck up" and that "they" tried to "play it off like it's a traffic stop."

Macklin testified that the wiretaps on the two telephones terminated on August 15, 1998. On August 28, 1998, Macklin obtained another 10-day consensual overhear order. The State played a recorded telephone conversation from August 31, 1998, in which Elem and Macklin spoke about doing "that same demonstration," which Macklin explained was another purchase of an eighth of a kilogram of cocaine. The State played a recorded telephone conversation from September 1, 1998, in which Macklin agreed to purchase another amount of cocaine on the following day.

Macklin further testified that on September 2, 1998, he went to the prearranged location and had $3,500 in official advanced recorded

funds. Elem arrived and got into Macklin's vehicle. Macklin gave Elem $3,250 for an eighth of a kilogram of cocaine. Elem exited the vehicle and drove away. The next time Macklin saw Elem was at the police station.

On September 2, 1998, Stroud, Sean Stroud, Williams, and Chandler were arrested. Macklin testified that he listened to all of the telephone calls intercepted by the two electronic surveillance orders. At the police station, Macklin played a tape for Stroud containing a compilation of conversations intercepted pursuant to the electronic surveillance orders. Macklin testified that when he played the tape, he asked Stroud if it was his voice on the tape and Stroud said yes. Macklin also testified that, in talking with Stroud, he recognized Stroud's voice as the same voice from the conversations obtained pursuant to the electronic surveillance orders.

Macklin testified that the police executed a search warrant on Stroud's residence at 15617 South State Street. The police recovered money, a clear plastic bag containing suspected cocaine, and a clear plastic bag containing suspected black tar heroin. One of the other officers recovered a hundred dollar bill that contained the serial numbers from one of the hundred dollar bills from the prerecorded funds.

Officer Michael Conley testified that he participated in the execution of the search warrant at 15617 South State. He either recovered or inventoried a small bottle of suspected narcotics, guns, ammunition, and money. He also recovered identification cards with the names of Jerry Hollins, Ronald Roberson, and Gregory Stroud. All three cards had the same person in the photo.

On March 18, 2004, the defendants tendered their motions to quash the search warrants and to suppress evidence.

On May 14, 2004, following the close of the State's evidence, Stroud filed a motion for a directed verdict and argued: (1) that section 405.1 of the Illinois Controlled Substances Act (720 ILCS 570/405.1 (West 1998)) is a void enactment; (2) that the public acts, which amended Article 108B, violated the single subject clause; (3) that the court erred in allowing Macklin to identify Stroud's voice on the tapes; (4) that the State failed to demonstrate any conspiratorial activity where only a buyer-seller relationship existed; and (5) that the trial court erred in failing to suppress the physical evidence obtained in the search.

On November 19, 2004, the trial court considered Stroud's motion to quash arrest and suppress evidence. The trial court made the following findings of fact and conclusions of law: (1) the police stopped Stroud in his vehicle; (2) the police found two kilograms of a controlled substance in an open container; and (3) the police recovered the

evidence and released Stroud. The trial court further found that, based upon the information gathered during the investigation, (1) it was reasonable for the officers to stop Stroud's vehicle, and (2) the narcotics were observed in plain view and recovered. Therefore, the trial court denied Stroud's motion to quash arrest and suppress the evidence, denied Stroud's motion to dismiss based on various violations of the single subject clause, and denied Stroud's motion to strike the voice identification. Finally, with regard to Stroud's motion for a directed finding, the trial court denied the motion as to all counts but the possession of heroin count and the possession of firearms counts.

The trial court, however, granted codefendant Sean Stroud's and codefendant Chandler's motions for a directed finding as to all counts. The trial court also granted Williams' motion for a directed finding as to the criminal drug conspiracy count but denied her motion as to the official misconduct count.

Stroud rested his case without presenting any evidence. On December 23, 2004, Stroud renewed his motion for a directed verdict of not guilty at the close of all evidence and incorporated the arguments he previously made in his earlier motion for a directed verdict. The trial court denied the motion.

On January 3, 2005, the court found Stroud guilty of criminal drug conspiracy, five counts of delivery of more than 100 but less than 400 grams of cocaine, one count of possession of more than 900 grams of cocaine with intent to deliver, and one count of possession of one to 15 grams of cocaine with intent to deliver.

On February 14, 2005, the court sentenced Stroud to concurrent 20-year terms in prison. The defendant's mittimus indicates that the defendant violated two statutes: (1) section 405.1 of the Illinois Controlled Substances Act (720 ILCS 570/405.1 (West 2004)) (criminal drug conspiracy), and (2) section 401(a)(2)(D) of the Illinois Controlled Substances Act (720 ILCS 570/401(a)(2)(D) (West 2004)) (the statute provides that a person shall be sentenced from 15 to 60 years' imprisonment for manufacture or delivery, or possession with intent to deliver, 900 grams or more of cocaine). While the mittimus indicates that the defendant was sentenced to 20 years' imprisonment for each of the convictions, the mittimus does not indicate whether the sentences were to run concurrently. However, at the sentencing hearing, the court stated that the sentences were to run concurrently.

On February 14, 2005, Stroud filed a posttrial motion and argued: (1) that the trial court erred in failing to find the public acts, which amended Article 108B, unconstitutional because they violated the single subject clause; (2) that the trial court erred in allowing the admission of telephonic digital information; (3) that the trial court

erred in failing to suppress the physical evidence seized in the warrantless traffic stop; (4) that the trial court erred in allowing voice identification; and (5) that he was not proved guilty of criminal conspiracy where the State's evidence only demonstrated a buyer-seller relationship. The trial court denied the motion.

## ANALYSIS

Stroud first contends that Public Acts 85—1203 and 86—763, which amended Article 108B (725 ILCS 5/108B *et seq.* (West 1998)), violate the single subject clause. Ill. Const. 1970, art. IV, §8(d). Specifically, he maintains that Public Acts 85—1203 and 86—763 violate the single subject clause in the Illinois Constitution because they addressed subjects other than electronic surveillance.

However, Stroud's appellate counsel noted at oral argument that this court need not reach this constitutional issue if the case can be decided on other grounds. We agree. This court will not consider a constitutional question if the case can be decided on other grounds because constitutional issues are only reached as a last resort. *People v. Brown*, 225 Ill. 2d 188, 200 (2007), citing *People v. Lee*, 214 Ill. 2d 476, 482 (2005); *In re E.H.*, 224 Ill. 2d 172, 178 (2006). We find that even if Stroud is correct and Public Acts 85—1203 and 86—763 violate the single subject clause in the Illinois Constitution, the version of Article 108B in effect prior to its amendment by the Public Acts remained in effect. See *People v. Brown*, 225 Ill. 2d 188, 200 (2007). Therefore, because Article 108B remained in effect, we find that we can resolve this case on nonconstitutional grounds, and we will address Stroud's second argument: whether the initial and subsequent application for the electronic criminal surveillance orders violated section 108B—4(a)(3)(viii) of the Code. 725 ILCS 5/108B—4(a)(3)(viii) (West 1998).

### Normal Investigative Procedures

■ Stroud contends that the initial application for the electronic criminal surveillance orders, and the subsequent application for the extension of the electronic criminal surveillance orders, violated section 108B—4(a)(3)(viii) of the Code (725 ILCS 5/108B—4(a)(3)(viii) (West 1998)) because they did not show that normal investigative procedures had failed.

Article 108B provides that the application for an order of interception shall include a particular statement of facts showing that other normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ. 725 ILCS 5/108B—4(a)(3)(viii) (West 1998). Section 108B—5 of the Code provides that a chief judge may enter an *ex parte*

order authorizing the interception of a private oral communication if the chief judge determines that normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ. 725 ILCS 5/108B—5(3) (West 1998). Our research reveals that the necessity provision in Article 108B mirrors the necessity provisions in the federal wiretap statute, the Omnibus Crime Control and Safe Streets Act of 1968 (Omnibus Act), which requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c) (2000); compare 725 ILCS 5/108B—5(3) (West 1998).

The Seventh Circuit has noted that section 2518(1)(c) of the Omnibus Act was not intended to ensure that wiretaps are used only as a last resort in investigations; rather, they are not to be routinely employed as the initial step in such investigations. *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006). The Seventh Circuit reviews the requirement of exhausting other investigative procedures in a practical and commonsense fashion. *McLee*, 436 F.3d at 763. The government does not have to demonstrate that prosecution would be impossible without the wiretap or that sufficient evidence for indictment could not be obtained through other means. *McLee*, 436 F.3d at 763. The Seventh Circuit has upheld the "necessity" of wiretap orders on the basis that the investigators had trouble identifying other members of the conspiracy (*United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991)), and that the wiretaps allowed the government to ascertain the extent and structure of the conspiracy (*United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995)). Finally, the Seventh Circuit reviews a finding of necessity for an abuse of discretion, with great deference being given to the issuing judge's determination. *McLee*, 436 F.3d at 763.[4]

---

[4]Following oral argument, this court granted Stroud's motion to cite additional authority regarding the proper standard of review for eavesdropping necessity. Stroud argued that there was a split in the federal circuit courts regarding the proper standard of review. Our research reveals that the majority of circuits, including the Seventh Circuit, use an abuse of discretion standard of review. See *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002) (holding that the conclusion that the wiretap was necessary in each situation is reviewed for an abuse of discretion and bringing the Tenth Circuit "into accordance with the authority of a majority of other circuits"), citing *United States v. Phillips*, 959 F.2d 1187, 1189 (3d Cir. 1992) (abuse of discretion); *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir.

■ In this case, the joint affidavit in support of the initial application for the two electronic surveillance orders averred that normal investigative techniques, including the use of a confidential informant, utility and telephone billing records, criminal background checks, computer study analysis, pen register analysis, garbage seizures and analysis, various surveillance techniques, and undercover purchases, failed to achieve all of the objectives associated with the investigation. The affidavit thoroughly summarized the investigation and explained the ways in which the above, normal investigative techniques were used and the corresponding results. At no time were the police able to make direct contact with Elem's supplier or to ascertain the full extent and structure of the conspiracy. For example, Elem refused to allow Macklin to speak with, meet, or have direct contact with Stroud. In fact, in an attempt to keep the supplier of the cocaine a secret, Elem would not allow Macklin to drop him off in front of Stroud's house. We hold that the trial court did not abuse its discretion in issuing the wiretap orders because the affidavits appended in support of the application sufficiently demonstrated that other normal investigative procedures had been tried and had failed, appeared to be unlikely to succeed if tried, or were too dangerous to employ. 725 ILCS 5/108B—4(a)(3)(viii) (West 1998).

Stroud also contends that the application for the extension of the electronic surveillance orders suffered from the same infirmities. However, the affidavit in support of the application for the extension averred that normal investigative techniques, including those described in the initial application, had failed to achieve all of the objectives associated with the investigation. Although the intercepted telephone calls indicated that Stroud was involved in various drug transactions, the police were unsuccessful in proving his involvement.

---

1989) (abuse of discretion); *United States v. Zambrana*, 841 F.2d 1320, 1329-30 (7th Cir. 1988) (abuse of discretion); *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985) (abuse of discretion); *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984) (abuse of discretion); *cf. United States v. Thompson*, 210 F.3d 855, 859 (8th Cir. 2000) (treating a district court's determination that necessity existed for a wiretap as a factual question reviewed for clear error); *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir. 1999) (holding court of appeals' role in reviewing issuance of wiretap order is not to make a *de novo* determination but to decide if facts were minimally adequate to support determination that was made); *United States v. David*, 940 F.2d 722, 728 (1st Cir. 1991) (formulating the question as whether " 'the issuing court could reasonably have concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed' [citation]"). Accordingly, this court will use an abuse of discretion standard of review.

For example, the affidavit explained that the police intercepted a telephone call to Stroud's residence from a telephone number listed to Bessie Johnson and that they agreed to meet for what the police believed to be a narcotics transaction. However, the surveillance units were unable to observe the transaction because vehicles obstructed their view. The affidavit also averred that the police, in response to information gathered from intercepted telephone calls, stopped a vehicle driven by Percy Washington that left Stroud's residence, but the subsequent search did not produce any results. Similarly, the police stopped vehicles driven by George Hill and Ben Israel that left Stroud's residence, but the subsequent searches did not produce any results. The affidavit also explained that the officers' success was minimized by the coded conversations, aliases, the use of multiple vehicles by members of the organization and, in the affiants' opinion, hidden compartments used to transport and conceal narcotics. Although the intercepted conversations provided some insight into the size of the drug trafficking organization, the police had not yet been able to ascertain the full extent and structure of the conspiracy. We hold that, based upon the aforementioned information in the affidavit, the trial court did not abuse its discretion in issuing two 30-day extension orders for the two electronic surveillance orders.

Stroud contends that the police failed to use various investigative tools, including questioning the suspects, offering immunity to the suspects, using regular search warrants, or attempting to infiltrate the organization. We note that the police did attempt to infiltrate the organization by assigning an undercover agent to the operation who performed numerous controlled buys through Elem. We also note that Macklin's attempts to further infiltrate the organization were thwarted by Elem's instance that Macklin not have contact with or know his supplier. In addition, although Stroud argues that the police failed to question or offer immunity to other suspects, Stroud ignores the fact that the police became aware of the suspects only after the initial electronic surveillance orders were granted. We find that the State was not required to demonstrate that prosecution would be impossible without the wiretap or that sufficient evidence could not be obtained through other means. See *McLee*, 436 F.3d at 763. Accordingly, we hold that the trial court did not abuse its discretion in ordering the initial electronic surveillance orders or in extending the orders for 30 days. *Brown*, 225 Ill. 2d at 200, citing *Lee*, 214 Ill. 2d at 482, and *In re E.H.*, 224 Ill. 2d at 178.

## Voice Identification

■ Next, Stroud contends that this court should vacate his conviction because the method used by the State to identify Stroud's voice

had no basis in Article 108B. Specifically, Stroud argues that Article 108B does not authorize an investigating officer to play tape recordings to arrestees for voice identification purposes. Macklin testified that when Stroud was arrested on September 2, 1998, Macklin spoke to Stroud at the police station, played a tape containing a compilation of various intercepted telephone conversations, and asked Stroud if the voice on the tape was his. Stroud admitted that his voice was on the tape. Macklin also testified that, after listening to all of the tapes and talking with Stroud at the police station, he recognized Stroud's voice on the tape.

Section 108B—9(b) of the Code provides, in pertinent part, that "[d]uplicate tapes or other recordings may be made for disclosure or use under paragraph (a) of Section 108B—2a of this Article." 725 ILCS 5/108B—9 (West 1998). Section 108B—2a explains when an officer is authorized to disclose or use recorded information and provides:

"(a) Any law enforcement officer who, by any means authorized in this Article, has obtained knowledge of the contents of any conversation overheard or recorded by use of an eavesdropping device or evidence derived therefrom, may disclose such contents to another law enforcement officer or prosecuting attorney to the extent that such disclosure is appropriate to the proper performance of the official duties of the person making or receiving the disclosure.

(b) Any investigative officer, including any attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in Section 108B—3 of this Act or law enforcement officer who, by any means authorized in this Article, has obtained knowledge of the contents of any conversation overheard or recorded by use of an eavesdropping device or evidence derived therefrom, may use the contents to the extent such use is appropriate to the proper performance of his official duties.

(c) Admissibility into evidence in any judicial, administrative, or legislative proceeding shall be as elsewhere described in this Article." 725 ILCS 5/108B—2a (West 1998).

The State argues that Macklin properly played the duplicate tape pursuant to section 108B—2a(b), which permitted Macklin to disclose and use the contents to the extent such use was appropriate to the proper performance of his official duties. 725 ILCS 5/108B—2a(b) (West 1998). However, as noted by Stroud, section 108B—9(b) provides that duplicate tapes may be made for disclosure or use under section 108B—2a(a), but does not provide that duplicate tapes may be made for disclosure or use under section 108B—2a(b). 725 ILCS 5/108B—9(b) (West 1998). We hold that if the legislature had intended to allow

an officer to make a duplicate tape and to disclose or use the tape generally as appropriate to the proper performance of his official duties, the legislature would have also referred to section 108B—2a(b) in section 108B—9(b). See *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 281 (1998) (noting if the legislature intended to include a provision in the statute, it could have easily written the statute to say so).

The State relies on *United States v. Rabstein*, 554 F.2d 190 (5th Cir. 1977), as support for its position. In *Rabstein*, the defendant argued that government agents, without prior judicial authorization, made duplicate tapes and played them to various persons for the purpose of obtaining voice identification. *Rabstein*, 554 F.2d at 193. In finding that the agents' actions were not improper, the Fifth Circuit noted that the Omnibus Act (18 U.S.C. §2518(8)(a) (2000)) provides, among other things, that duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517. *Rabstein*, 554 F.2d at 193. Section 2517(1) provided that an officer who had obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, could disclose the contents to another officer to the extent that the disclosure was appropriate to the proper performance of the official duties of the officer making or receiving the disclosure. 18 U.S.C. §2517(1) (2000). Section 2517(2) provided that an officer who had obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom could use such contents to the extent such use was appropriate to the proper performance of his official duties. 18 U.S.C. §2517(2) (2000). The Fifth Circuit concluded that the government's conduct complied with section 2517(2). *Rabstein*, 554 F.2d at 193.

*Rabstein* is distinguishable from the instant case. In *Rabstein*, the Omnibus Act (18 U.S.C. §2518(8)(a) (2000)) permitted duplicate recordings to be made for use or disclosure pursuant to section 2517(1) (disclosure of contents to another officer) *and* section 2517(2) (use of contents as was appropriate to the proper performance of his official duties). However, in this case, section 108B—9, the Illinois statute, only permits duplicate tapes or other recordings to be made for disclosure to another officer or prosecuting attorney. 725 ILCS 5/108B—9(b) (West 1998) (duplicate tapes or recordings may be made for disclosure or use under paragraph a of section 108B—2a of this article). Macklin used a duplicate tape for disclosure to a private party (Stroud) and not for disclosure to another law enforcement officer or prosecuting attorney as permitted by section 108B—9 of the Code. 725 ILCS 5/108B—9 (West 1998). Therefore, Macklin was not complying with section 108B—9 when he obtained the admission from Stroud

after disclosing the contents of the duplicate tape. 725 ILCS 5/108B—9(b) (West 1998).

Although the State violated section 108B—9, it does not result in the need for a new trial. As the State properly notes, Macklin's voice identification did not rest solely on Stroud's admission that the voice on the tape was his. Macklin testified that at the time of Stroud's arrest, he had listened to all of the intercepted telephone calls and, in talking with Stroud at the police station, he recognized Stroud's voice as the same voice recorded during the conversations intercepted pursuant to the electronic surveillance orders. We also note that there are numerous times during the intercepted conversations in which the caller either asked to speak with "Greg," or the speaker identified himself as "Greg." Therefore, Macklin had an independent basis on which to identify "Greg" Stroud's voice on the tapes. Accordingly, because the trial court found Macklin's testimony credible, the trial court did not abuse its discretion by admitting Macklin's testimony identifying Stroud's voice at the trial. See *People v. Curry*, 56 Ill. 2d 162, 174 (1973) (the supreme court rejected the defendant's argument that she was not proved guilty beyond a reasonable doubt because of, in part, an officer's ability to identify the defendant's voice as that of the person with whom the officer spoke over the phone, and noted that the trial court, as the trier of fact, evaluates witness credibility).

### The Criminal Drug Conspiracy Statute Was in Existence Even Though Public Act 89—404, Which Amended the Statute, Violates the Single Subject Clause

■ Next, Stroud contends that when he was charged with criminal drug conspiracy on September 30, 1998, the offense did not exist because Public Act 89—404, which reenacted and amended the criminal drug conspiracy statute, section 405.1 (720 ILCS 570/405.1 (West 1998)), was declared unconstitutional because it violated the single subject clause. We note that Public Act 86—809 enacted the offense of criminal drug conspiracy, became effective January 1, 1990, and provides as follows:

"Sec. 405.1. (a) Elements of the offense. A person commits criminal drug conspiracy when, with the intent that an offense set forth in Section 401, Section 402, or Section 407 of this Act be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit such an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator.

(b) Co-conspirators. It shall not be a defense to conspiracy that the person or persons with whom the accused is alleged to have conspired:

(1) Has not been prosecuted or convicted, or
(2) Has been convicted of a different offense, or
(3) Is not amenable to justice, or
(4) Has been acquitted, or
(5) Lacked the capacity to commit an offense.
    (c) Sentence. A person convicted of criminal drug conspiracy may be fined or imprisoned or both not to exceed the maximum provided for the offense which is the object of the conspiracy." Pub. Act 86—809, eff. January 1, 1990 (adding Ill. Rev. Stat. 1991, ch. 56½, par. 1405.1).

On May 24, 1995, the General Assembly passed Public Act 89—404, which was approved and became effective August 20, 1995. The public act provided that it was "An Act in relation to governmental matters," and it amended numerous statutes. Public Act 89—404 reenacted subsection (a), the elements provision, and subsection (b), the co-conspirator provision, of section 405.1 of the criminal drug conspiracy statute. We note, however, that Public Act 89—404 amended subsection (c) of the criminal drug conspiracy statute as follows:

    "(c) Sentence. A person convicted of criminal drug conspiracy may be fined or imprisoned or both, *but any term of imprisonment imposed shall be not less than the minimum nor more than the maximum provided for the* offense which is the object of the conspiracy." (Emphasis added.) Pub. Act 89—404, eff. August 20, 1995 (amending 720 ILCS 570/405.1 (West 1996)).

Therefore, while Public Act 89—404 merely reenacted subsections (a) and (b), it amended subsection (c) of the criminal drug conspiracy statute. Pub. Act 89—404, eff. August 20, 1995 (amending 720 ILCS 570/405.1 (West 1996)).

On March 11, 1998, the Second District held that Public Act 89—404 violated the single subject clause. See *People v. Reedy*, 295 Ill. App. 3d 34, 42 (1998). The court noted that, as enacted, Public Act 89—404 addressed no less than five distinct legislative subjects and amended nine different statutory codes covering both criminal and civil matters, and the court was unable to identify the natural and logical connection uniting the amendments. *Reedy*, 295 Ill. App. 3d at 42. However, the court emphasized that its ruling did not address the substantive constitutionality of the public act's individual components and that the legislature was free to revisit the public act's various provisions in future legislation. *Reedy*, 295 Ill. App. 3d at 44; see also *People v. Pitts*, 295 Ill. App. 3d 182, 190 (1998) (holding that Public Act 89—404 violates the single subject clause); *People v. Wilson*, 295 Ill. App. 3d 228, 240 (1998) (same); *People v. Worden*, 299 Ill. App. 3d 836, 842 (1998) (same). On May 15, 1998, the General Assembly passed

Public Act 90—593, which was approved and became effective June 19, 1998, and reenacted the entire criminal drug conspiracy statute that was reenacted and amended in Public Act 89—404. Pub. Act 90—593, eff. June 19, 1998.

On September 30, 1998, a grand jury returned a true bill and indicted Stroud for engaging in a criminal drug conspiracy. Specifically, it alleged that Stroud committed the offense of criminal drug conspiracy from on or about February 6, 1998, until on or about September 2, 1998.

On March 29, 1999, the Illinois Supreme Court decided *People v. Reedy*, 186 Ill. 2d 1, 12 (1999). The *Reedy* court held that Public Act 89—404 violated the single subject clause of the Illinois Constitution and was unconstitutional in its entirety. *Reedy*, 186 Ill. 2d at 11-12. As Stroud correctly points out, " '[w]hen a statute is held unconstitutional in its entirety, it is void *ab initio*.' " *People v. Gersch*, 135 Ill. 2d 384, 390 (1990), quoting *People v. Manuel*, 94 Ill. 2d 242, 244-45 (1983). However, "[t]he effect of enacting an unconstitutional amendment to a statute is to leave the law in force as it was before the adoption of the amendment." *Gersch*, 135 Ill. 2d at 390.

Therefore, in this case, when Public Act 89—404 was declared unconstitutional, the law in existence prior to its amendment, Public Act 86—809, which originally enacted the offense of criminal drug conspiracy and codified the elements of the offense, was in effect on January 1, 1990, and remained in effect because Public Act 89—404 was void at the time it was enacted. *Gersch*, 135 Ill. 2d at 390. We find that the offense of criminal drug conspiracy was an indictable offense because either Public Act 86—809 or Public Act 90—593,[5] which respectively enacted and reenacted the criminal drug conspiracy statute, were at all times in effect during the drug conspiracy in this case, which began on February 6, 1998, and ended on September 2, 1998. Neither Public Act 86—809 nor Public Act 90—593 has been declared unconstitutional, and Public Act 90—593 does not violate the single subject clause of the Illinois Constitution. See *People v. Terry*, 329 Ill. App. 3d 1104, 1110 (2002) (finding that Public Act 90—593 cured the defects of Public Act 89—404 as determined by *Reedy* and does not violate the single subject clause of the Illinois Constitution). Accordingly, because Public Acts 86—809 and 90—593, which enacted and reenacted the offense of criminal drug conspiracy, were in effect at all times during the criminal drug conspiracy in this case, the State did not err in charging Stroud and the trial court did not err in convict-

---

[5]We note that Public Act 90—593 would only apply to that part of the conspiracy that occurred after June 19, 1998, the effective date of the Act.

ing Stroud of violating the criminal drug conspiracy statute. *Gersch*, 135 Ill. 2d at 390.

## Sufficiency of the Evidence

■ Stroud next contends the State failed to prove him guilty beyond a reasonable doubt of violating the criminal drug conspiracy statute. Specifically, he contends that the State only proved the existence of a buyer-seller relationship, which is insufficient to form the basis for a criminal conspiracy. We note that Stroud was charged with criminal drug conspiracy, and the indictment alleged that he conspired to deliver 100 to 400 grams of cocaine, possessed and intended to deliver 900 grams or more of cocaine, and possessed and intended to deliver 1 to 15 grams of cocaine, in violation of section 401 of the Illinois Controlled Substances Act. The test for reviewing a challenge to the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *People v. Boclair*, 129 Ill. 2d 458, 474 (1989). We defer to the trier of fact to determine witness credibility, resolve conflicts in evidence, and draw reasonable inferences from the evidence. *People v. Gill*, 355 Ill. App. 3d 805, 810 (2005). Whether the requisite criminal intent existed is a question for the trier of fact, and this court will not disturb such a determination unless a reasonable doubt exists as to the defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 354 (2001).

A person commits the offense of criminal drug conspiracy when, with the intent that an offense set forth in section 401,[6] section 402,[7] or section 407[8] of the Illinois Controlled Substances Act be committed, he agrees with another to the commission of that offense. 720 ILCS 570/405.1 (West 1998). The person or co-conspirator must commit an act in furtherance of the agreement. 720 ILCS 570/405.1 (West 1998). It shall not be a defense that the co-conspirator (1) has not been prosecuted or convicted, (2) has been convicted of a different offense, (3) is not amenable to justice, (4) has been acquitted, or (5) lacked the capacity to commit an offense. 720 ILCS 570/405.1 (West 1998). The

---

[6]Section 401 of the Illinois Controlled Substances Act addresses the manufacture or delivery of a controlled or counterfeit substance. 720 ILCS 570/401 (West 1998).

[7]Section 402 of the Illinois Controlled Substances Act addresses possession of a controlled or counterfeit substance. 720 ILCS 570/402 (West 1998).

[8]Section 407 of the Illinois Controlled Substances Act addresses, for example, delivery of a controlled, counterfeit or look-alike substance to a person under 18 years of age and violations on or near school or public housing agency property or public park. 720 ILCS 570/407 (West 1998).

trier of fact may infer the existence of an agreement amongst co-conspirators to do a criminal act based on the surrounding facts and circumstances. *People v. Garth*, 353 Ill. App. 3d 108, 121 (2004). Due to the clandestine nature of conspiracy, our courts have permitted broad inferences to be drawn from the circumstances, acts and conduct of the parties. *Garth*, 353 Ill. App. 3d at 121.

We find that during the trial, the State presented the police officers' observations, videotapes and the audiotapes of 106 recorded conversations, many of which contained Stroud's voice. The State's evidence established an agreement between Elem and Stroud to deliver controlled substances: (1) Macklin would indicate to Elem that he wanted to purchase cocaine; (2) Elem would call Stroud and Stroud would inform Elem whether drugs were available and, if so, at what price; (3) Elem would then relay to Macklin the information Elem and Stroud discussed; (4) Elem and Macklin would meet at a prearranged location and Macklin would give Elem the amount of money Elem and Stroud predetermined; (5) Elem would drive to Stroud's house and retrieve the drugs; and (6) Elem would return to the prearranged location and deliver the drugs to Macklin. In addition, the State's evidence established that Elem and Stroud's agreement had them transacting business in a standardized manner: (1) Stroud and Elem conducted the transactions with Macklin as follows: (a) Elem received the money before giving Macklin the drugs, (b) Elem counted the money when it was given to him, and (c) Elem did not bring anyone to Stroud's house; (2) Stroud reaped financial benefits from Macklin's purchases because the police recovered prerecorded funds used during the controlled buys from Stroud's residence; (3) when Macklin told Elem on June 27, 1998, that he was not going to purchase drugs until the following Monday or Tuesday, Elem told Stroud what they had been talking about would happen Monday or Tuesday; and (4) when there was a shortage in the weight of the agreed-upon drugs, Elem indicated that his supplier would make up the shortage in a subsequent purchase. The State also presented numerous conversations between Stroud and other men during which they discussed the availability of drugs and the corresponding prices of the drugs, and the court could reasonably conclude that these men were engaged in drug transactions. Therefore, the police officers' observations, the videotapes and the 106 recorded conversations established Stroud's involvement and agreement with Elem to possess and deliver controlled substances. 720 ILCS 570/405.1 (West 1998). Accordingly, we hold that the evidence, when viewed in the light most favorable to the prosecution, established the elements of the offense of criminal drug conspiracy and Stroud's guilt beyond a reasonable doubt.

Stroud argues that the State presented nothing more than a buyer-seller relationship and that such a relationship does not rise to the level of a conspiracy. He cites numerous federal decisions that stand for the proposition that a buyer-seller relationship is insufficient to establish a conspiracy to distribute drugs. See *United States v. Thomas*, 284 F.3d 746, 752-53 (7th Cir. 2002) (buyer-seller relationship insufficient to create a conspiracy); *United States v. Rivera*, 273 F.3d 751, 755 7th Cir. 2001) (same); *United States v. Contreras*, 249 F.3d 595, 598-99 (7th Cir. 2001) (same); *United States v. Colon*, 549 F.3d 565 (7th Cir. 2008) (same).

Stroud is correct that the federal courts have consistently held that evidence establishing a mere buyer-seller relationship is not enough to prove a conspiracy to distribute drugs and that the government must prove that the defendant agreed to commit a crime other than the sale itself, such as the subsequent distribution of drugs by the buyer. See *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006); *Rivera*, 273 F.3d at 755. The federal courts generally consider factors such as the length of the relationship, the established method of payment, the extent to which the transactions were standardized, and the level of mutual trust. *Contreras*, 249 F.3d at 599. They have also looked to whether the seller was aware of the buyer's resale objectives and the quantities of drugs involved. *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005). As the Seventh Circuit has summarized, " 'we are looking for evidence of "a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture." [Citation.]' " *Contreras*, 249 F.3d at 599.

In this case, the evidence established that Elem and Stroud had more than a buyer-seller relationship. Throughout the eight-month investigation, Macklin repeatedly purchased drugs from Elem; Elem pointed out to Macklin that his supplier could produce drugs at any time; and Stroud consistently provided Elem with drugs. The transactions were standardized in that the people involved remained the same, the prices were consistent, the location of the meetings was consistent, and Stroud and Elem insisted that Macklin use the same payment and delivery method. *Cf. Thomas*, 284 F.3d at 753 (the transactions were not standardized where neither the source nor the amount of the cocaine was always the same); *Rivera*, 273 F.3d at 756 (the transactions were not standardized where they involved different people, locations, and methods of payment and delivery).

Moreover, it is clear Stroud was aware Elem was selling the drugs to Macklin as the transactions were occurring because Stroud reminded Elem to count the money when Macklin gave it to him, and

when Mackin told Elem a transaction would occur the following Monday or Tuesday, Elem called Stroud and told him that the transaction would occur on one of those days. It is also clear that Stroud had a vested interest in Elem's sales to Macklin because Elem informed Macklin that the supplier would give discounts based on consistent purchases, because Elem indicated Stroud's willingness to make up the shortage at a later transaction, and because the police recovered a bill used during one of the controlled buys from Stroud's residence. *Cf. Thomas*, 284 F.3d at 752 (noting that awareness of a conspiracy does not equate to membership in the conspiracy).

Based upon the evidence presented, the trial court could reasonably infer that Stroud and Elem did not have a buyer-seller relationship, but that Stroud had an agreement with Elem and was part of the conspiracy. Stroud did not "front" the drugs to Elem so that Stroud's payment would derive from Elem's resale of the drug; instead, by insisting that Elem return with the money before the drugs were tendered to Elem and delivered to Macklin, Stroud was assured that the transactions occurred simultaneously and Elem had a ready buyer. Stroud and Elem's sales were not episodic sales or sales that occurred by happenstance. *Cf. Contreras*, 249 F.3d at 600 (no evidence that the middleman had a stake in the supplier's sales or that the middleman's assistance was anything more than casual or happenstance); *Thomas*, 284 F.3d at 753 (the transactions were "episodic"); *Rivera*, 273 F.3d at 755 (evidence only showed a series of spot dealings at arm's length between dealers who had no interest in the success of each other's enterprise); *Colon*, 549 F.3d at 568 (the buyer defendant did nothing to help the source establish a delivery system). Although no single factor listed above is dispositive, taken as a whole, we find that the trial court correctly found that Stroud participated in a criminal drug conspiracy. Accordingly, we hold that the evidence presented to the trial court established that Stroud and Elem did not have a buyer-seller relationship but were involved in a conspiracy because they had an agreement to sell drugs.

## Motion to Suppress

■ Stroud's next contention is that the trial court erred by denying his motion to suppress the physical evidence seized during the August 6, 1998, traffic stop. Stroud cites numerous cases which stand for the proposition that a fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. See, *e.g.*, *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (the fact that a judge or jury accepted testimony does not guarantee it was reasonable to do so). Stroud contends that Officer

Lappe's testimony regarding the search of the vehicle is unbelievable and argues that "[i]t is perverse to the point of being 'inherently improbable' that Stroud, on an August afternoon, would be ferrying dual kilos of dope, in an 'open' tote bag, driving a red Corvette with windows open and 'T-tops' off."

When a trial court's ruling on a motion to suppress evidence involves factual determinations and credibility assessments, the ruling is subject to reversal only if it is manifestly erroneous. *People v. Buss*, 187 Ill. 2d 144, 204 (1999). However, where neither the facts nor the credibility of witnesses is disputed, *de novo* review is proper. *People v. Anthony*, 198 Ill. 2d 194, 201 (2001).

The United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6. A warrantless search and seizure is *per se* unreasonable unless an exception exists. *People v. Parker*, 354 Ill. App. 3d 40, 44-45 (2004). Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they lawfully stop the vehicle and have probable cause to believe that the vehicle contains contraband or evidence of criminal activity. *Parker*, 354 Ill. App. 3d at 45. An officer may make a limited stop of an individual when the officer has a reasonable, articulable suspicion that a crime has been committed or is about to be committed. *People v. Baskins-Spears*, 337 Ill. App. 3d 490, 499 (2003), citing *People v. Hamilton*, 251 Ill. App. 3d 655 (1993), citing *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The reviewing court must look at the totality of the circumstances to determine whether the officer had a reasonable belief that the person was involved in criminal activity. *Baskins-Spears*, 337 Ill. App. 3d at 499, citing *People v. Avant*, 331 Ill. App. 3d 144, 151 (2001). Probable cause to search the vehicle exists where the totality of the facts and circumstances known to the officer at the time of the search, in light of the officer's experience, would cause a reasonably prudent person to believe that a crime had occurred and that evidence of the crime is contained in the automobile. *Parker*, 354 Ill. App. 3d at 45, citing *People v. Stout*, 106 Ill. 2d 77, 86 (1985); *People v. Clark*, 92 Ill. 2d 96, 100 (1982); *People v. Erickson*, 31 Ill. 2d 230, 233 (1964). The scope of the warrantless search extends to every part of the vehicle that may conceal the object of the search. *Parker*, 354 Ill. App. 3d at 45, citing *People v. Schrems*, 224 Ill. App. 3d 988, 995-96 (1992); *People v. Beil*, 110 Ill. App. 3d 291, 293 (1982).

The threshold question we must answer is whether Officer Lappe had probable cause to stop Stroud's car. During the eight-month investigation, the officers made observations and compiled 106 recorded conversations and numerous surveillance videos. The

evidence established the following: (1) Macklin would indicate his desire to purchase cocaine to Elem; (2) Elem would contact Stroud; (3) Elem would then verify the availability of drugs to Macklin; (4) Elem and Macklin would meet at a prearranged location; (5) Macklin would give Elem money; (6) Elem would take the money to Stroud; (7) Elem would leave Stroud's residence with the cocaine; and (8) Elem would deliver the cocaine to Macklin. Therefore, based on the officers' observations during the eight-month investigation and the information obtained in the videotapes and the 106 recorded conversations intercepted by the officers, the officers had reasonable grounds to believe Stroud supplied Elem with cocaine.

Moreover, the police learned that Stroud was transporting drugs on the day of the traffic stop. The police intercepted a telephone conversation on August 4, 1998, two days before the traffic stop, between Stroud and a man identified as Dwight. Dwight asked Stroud if he had ordered a "pair of shoes." Stroud responded that he had one and was going to see if he could get the other one. The police also intercepted a telephone conversation on August 5, 1998, the day before the traffic stop, between Stroud and Dwight. Dwight reminded Stroud about the "pair of shoes." Later that day, in another intercepted conversation, Stroud told Dwight that he was in possession of the cocaine but did not know the price for it. The police also intercepted a telephone conversation on August 6, 1998, the morning of the traffic stop, in which Stroud confirmed that Dwight wanted "twins." Later that afternoon, the police intercepted a conversation in which Stroud told Dwight to make sure his money was correct because Stroud had to take the money to another location to pay for the product. Macklin testified that, in his experience, the men were negotiating the sale of two kilograms of cocaine. Based upon the aforementioned information, the police had a reasonable, articulable suspicion that a crime had been committed or was about to be committed, and therefore they had sufficient evidence to justify a stop of Stroud's vehicle. See also *Baskins-Spears*, 337 Ill. App. 3d at 499-500 (reversing the trial court's grant of the defendant's motion to suppress evidence where, based on a four-month narcotics investigation, the search was reasonable because the police had reason to suspect that the defendant was trafficking narcotics on the day of the stop).

Next, we must determine whether the knowledge possessed by the officers involved in the Stroud investigation could be imputed to Officer Lappe and the dispatcher. Stroud argues that the State's failure to call the dispatcher as a witness was fatal and he cites *People v. Bramlett*, 341 Ill. App. 3d 638, 649-50 (2003), in support of his position. *Bramlett* fails to provide support for Stroud's position because

the officers in that case had conducted a 12-hour investigation and there was no evidence in the record that indicated that the officers obtained the statement that allegedly connected the defendant to the murder before his arrest. In this case, there was an extensive eight-month investigation and the evidence gathered provided the officers involved in the investigation with evidence connecting Stroud to the cocaine and, since the officers were acting in concert, their knowledge could be imputed to the dispatcher and to Officer Lappe, who made the traffic stop. Our courts have consistently recognized that when officers are working in concert, probable cause can be established from all the information collectively received by the officers, even if that information is not specifically known to the officer who made the arrest. *Buss*, 187 Ill. 2d at 204.

Officer Lappe testified that the dispatcher instructed him to initiate the stop, but he also testified that he had been informed about some of the intercepted conversations involving Stroud and the transportation of two kilograms of cocaine. We find that Officer Lappe possessed information that was not possessed by the dispatcher. Officer Lappe's testimony establishes that he was aware of the Stroud investigation, and Lappe's knowledge, when coupled with the information possessed by the other officers engaged in the Stroud investigation, would cause a reasonably prudent person to believe that a crime had occurred and that evidence of the crime was contained in Stroud's automobile. See *Parker*, 354 Ill. App. 3d at 45. Therefore, when the information obtained over eight months by the officers engaged in the Stroud investigation is imputed to the other officers, and is coupled with the information independently possessed by Officer Lappe, we find that Officer Lappe possessed sufficient information to have probable cause to stop Stroud's car.

The final issue we must address is whether Officer Lappe had probable cause to search Stroud's car. As indicated above, through the 106 recorded conversations, the officers' observations and the numerous video surveillance tapes collected during the eight-month investigation, the police had reason to believe Stroud was Elem's supplier of cocaine. Moreover, in the couple of days preceding the traffic stop, the police intercepted telephone conversations in which Stroud and Dwight discussed the order of a "pair of shoes," or two kilograms of cocaine. Stroud said he was in possession of the cocaine but did not know the price. Finally, on the day of the traffic stop, the police intercepted a conversation in which Stroud told Dwight to make sure his money was correct because Stroud had to take the money to another location to pay for the product. Based upon these intercepted conversations, as well as the observations made during the investiga-

tion, the police had sufficient facts to believe that Stroud was in possession of two kilograms of cocaine, that Stroud was going to bring the cocaine to Dwight that afternoon, and that the drugs were in the vehicle. Accordingly, we hold that the police had probable cause to conduct a warrantless search of every part of Stroud's vehicle. See *Parker*, 354 Ill. App. 3d at 45.

Stroud urges this court to conclude that the recovered bag was closed, and therefore a warrant was needed to view the contents of the closed bag. We note, however, that an officer who stops a vehicle and has probable cause to believe that the vehicle is carrying contraband, as in this case, may lawfully search the vehicle and any closed containers in the vehicle that might reasonably contain the object of the search. See *People v. Smith*, 95 Ill. 2d 412, 418 (1983), citing *United States v. Ross*, 456 U.S. 798, 825, 72 L. Ed. 2d 572, 594, 102 S. Ct. 2157, 2173 (1982). Moreover, the trial court found Officer Lappe's testimony credible and, in denying the motion to quash arrest and suppress evidence, found that the two kilograms of a controlled substance were observed in plain view and were in an open container. Without evidence in the record to rebut the officer's testimony, there is no evidentiary basis for this court to find, even if we were inclined to find the officer's testimony suspect, that the trial court's finding that Officer Lappe was credible was manifestly erroneous. See *Buss*, 187 Ill. 2d at 204. This court will not reverse a trial court's ruling on a motion to suppress evidence where there is no evidence in the record to rebut the officer's testimony. Accordingly, we find that the trial court did not err when it denied Stroud's motion to quash arrest and suppress evidence, and we affirm Stroud's convictions and sentences.

■ Following this court's issuance of this court's opinion in the instant case, the defendant filed a petition for rehearing and argued for the first time before this court, among other things, that the trial court erred when it sentenced the defendant on both the drug conspiracy conviction (720 ILCS 570/405.1 (West 2004)) and the possession with intent to deliver 900 grams or more of cocaine (720 ILCS 570/401(a)(2)(D) (West 2004)) (the statute provides that a person shall be sentenced from 15 to 60 years' imprisonment for manufacture or delivery, or possession with intent to deliver, 900 grams or more of cocaine). The defendant cites section 8—5 of the Illinois Criminal Code of 1961, which provides "no person shall be convicted of both the inchoate and the principal offense." 720 ILCS 5/8—5 (West 1998).

We note that the following colloquy took place during sentencing:

"[Defense counsel]: Your Honor, regarding the sentence on Count 1, the conspiracy count, it is my understanding, so that we don't have to come back within 30 days, it is my understanding that that

merges with the substantive count, the 20-year substantive count. You cannot impose a separate sentence on the conspiracy because it is an inchoate offense.

The Court: That's correct.

[Defense counsel]: Thank you."

The record establishes that the trial court agreed that the defendant could not be convicted of criminal conspiracy (the inchoate offense) and possession with intent to deliver cocaine (the principal offense), but the mittimus indicates that the defendant was convicted of conspiracy. See 735 ILCS 5/2—1801 (West 2006) (the statute provides that in all cases when a person is committed to the Department of Corrections by virtue of a judgment or order signed by a judge, the copy of such judgment or order shall constitute the mittimus). See also *People v. Millsap*, 374 Ill. App. 3d 857, 869-70 (2007) (vacating the defendant's conviction of criminal drug conspiracy where he was also convicted of unlawful delivery of a controlled substance); *People v. Lewis*, 361 Ill. App. 3d 1006, 1019 (2005) (vacating the defendant's conviction of criminal drug conspiracy where he was also convicted of delivery of a controlled substance), affirmed *People v. Lewis*, 223 Ill. 2d 393 (2006); *People v. Haycraft*, 349 Ill. App. 3d 416, 429-30 (2004) (vacating the defendant's conviction and sentence for criminal drug conspiracy where he was also convicted of unlawful manufacture of a controlled substance); *People v. Castaneda*, 299 Ill. App. 3d 779, 780-81 (1998) (noting that the trial court erred in entering convictions and imposing sentences on the two counts of criminal drug conspiracy where the defendant was already convicted of the underlying principle offenses, namely unlawful possession of a controlled substance with intent to deliver and unlawful delivery of a controlled substance); *People v. Sonntag*, 238 Ill. App. 3d 854, 856, 863 (1992) (vacating the defendant's convictions and sentences for criminal drug conspiracy where he was also convicted of four counts of unlawful delivery of a controlled substance). Accordingly, in accord with section 8—5 of the Criminal Code, we affirm the defendant's convictions and sentences for intent to deliver cocaine (the principal offense) but vacate the defendant's conviction and sentence for criminal drug conspiracy (the inchoate offense) because "[n]o person shall be convicted of both the inchoate and the principal offense." 720 ILCS 5/8—5 (West 1998).

The defendant requests that this court remand for a new sentencing hearing. Illinois cases hold "[w]here a defendant is convicted of multiple offenses, reversal of one conviction does not *per se* require that the defendant be resentenced on the remaining conviction or convictions, as long as the record shows that the trial court considered the offenses separately and sentenced the defendant separately on

each offense." *Sonntag*, 238 Ill. App. 3d at 857, citing *People v. Hagan*, 199 Ill. App. 3d 267, 290-91 (1990). In the instant case, the trial court indicated during sentencing: (1) that it was imposing a 20 years' imprisonment sentence for the criminal drug conspiracy conviction, and (2) that it was imposing a 20 years' imprisonment sentence for the convictions for possession with intent to deliver. Moreover, as noted above, the trial court also agreed that the defendant could not be sentenced for the criminal drug conspiracy conviction because it was an inchoate offense. Therefore, the trial court implicitly acknowledged the difference between the inchoate and the complete offenses. Accordingly, we decline to remand for a new sentencing hearing because the record establishes that the trial court considered the offenses separately and sentenced the defendant separately on each offense. *Sonntag*, 238 Ill. App. 3d at 857, citing *Hagan*, 199 Ill. App. 3d at 290-91.

In its response to the defendant's petition for rehearing, the State notes that the mittimus does not include the defendant's five convictions of delivery of more than 100 but less than 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2004)). The record reveals that the trial court found the defendant guilty of five counts of delivery of more than 100 but less than 400 grams of cocaine and sentenced the defendant to concurrent 20 years' imprisonment for each of the convictions, which were to run concurrently with the 20 years' imprisonment for possession with intent to deliver more than 900 grams of cocaine. Accordingly, we direct the clerk to correct the mittimus to reflect (1) that the defendant was convicted of one count of possession with intent to deliver more than 900 grams of cocaine (720 ILCS 570/401(a)(2)(D) (West 2004)); (2) that the defendant was also convicted of five counts of delivery of more than 100 but less than 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2004)); and (3) that the defendant should not have been convicted of conspiracy; therefore, the conspiracy conviction and sentence is stricken from the mittimus. See *People v. Douglas*, 381 Ill. App. 3d 1067, 1069 (2008), citing 134 Ill. 2d R. 615(b)(1) (appellate court may correct trial court orders as necessary) and *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (1992) (appellate court may correct mittimus and sentencing orders without remanding the cause to the trial court).

## CONCLUSION

For the above reasons, we affirm defendant's convictions and sentences for intent to deliver cocaine, vacate the defendant's convic-

tion and sentence for criminal drug conspiracy, and direct the clerk of the circuit court of Cook County to correct the mittimus.

Affirmed in part and vacated in part with directions.

MURPHY and STEELE, JJ., concur.