No. 2--08--0552        Filed: 12-18-09

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--1333 |
| JEFFREY A. CHRISTMAS, | ) ) | Honorable John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the opinion of the court:

Following a jury trial, defendant, Jeffrey A. Christmas, was found guilty of unlawful possession of a controlled substance with the intent to deliver more than 400 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(C) (West 2002)), and the trial court sentenced him to 17 years' imprisonment. Defendant timely appealed and raises the following issues: (1) whether the court erred in denying his motion to suppress evidence; and (2) whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. For the reasons that follow, we hold that the court erred in denying defendant's motion to suppress evidence, and we reverse.

On May 11, 2005, defendant was indicted on one count of unlawful criminal drug conspiracy (720 ILCS 570/405.1(a) (West 2002)) and one count of unlawful possession of a controlled

substance with the intent to deliver more than 400 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(C) (West 2002)).  On August 5, 2005, defendant filed a motion to suppress evidence.

The following testimony was adduced at the hearing on defendant's motion to suppress evidence.  Michael J. Biegalski, a special agent with the Federal Bureau of Investigation (FBI), testified that, on September 8, 2003, he was in Chicago monitoring a court-authorized wiretap of Melvin Gordon's telephone.  He had been investigating Gordon and Gordon's associates for about one year, and he had been monitoring Gordon's telephone calls for about three months.  On September 8, 2003, at 10:32 a.m., he overheard a phone call between Gordon and an unknown male.  During the call:

> "The unidentified male had requested to Mr. Gordon that he would like to go half the way.  And then a negotiation began on the price of what they were talking about and there was some confusion as to the actual price they were talking.  Mr. Gordon basically said 20.5 was his cost and he would like to make five bucks off of that.  Brought the total to 21, and then unidentified male at that time said I would like to do half of that."

According to Biegalski, Gordon and the unidentified caller planned to meet at the Bertrand Bowling Lanes (the bowling alley) at 12 o'clock.

After the call ended, Biegalski notified the Lake County Metropolitan Enforcement Group and Robert Genualdi, a special agent with the Drug Enforcement Administration, that he believed that Gordon was going to conduct a narcotics transaction at the bowling alley at noon, and Biegalski requested that they set up surveillance.  Genualdi did so, keeping in contact with Biegalski via telephone.

Biegalski next overheard two phone calls between Gordon and Richard Cooks, one of Gordon's narcotics associates, regarding the quantities of cocaine that they had at a separate location. Gordon asked Cooks to bring "one" to "the lab."

At 11:47 a.m., Biegalski overheard a second phone call between Gordon and the unidentified caller whom Biegalski had heard during the 10:32 a.m. call. During this call, there was an inquiry as to when the unidentified male would arrive. Gordon told the unidentified male that he was already at the location, and the unidentified male stated that he was about five minutes away.

Biegalski testified that he believed that the drug transaction was going to involve a half-kilogram of cocaine, which has a street value of approximately $18,500 to $24,000 per kilogram.

At 11:52 a.m., Genualdi, who had been conducting surveillance in the parking lot of the bowling alley, informed Biegalski that he observed a red BMW enter the parking lot. At 11:53 a.m., Genualdi informed Biegalski that he observed a Ford van, driven by Gordon, pull into the parking lot and park behind the red BMW. Genualdi told Biegalski that he observed the driver of the BMW, an unidentified male, go to the trunk of the BMW, open the trunk, and close the trunk. The van departed the lot, and the driver of the BMW entered the bowling alley.

Genualdi next informed Biegalski that he observed the Ford van reenter the parking lot and park near the BMW. He also observed a second unidentified male standing near the entrance of the bowling alley with the first unidentified male. Genualdi then saw Gordon and the first unidentified male enter the BMW. Gordon drove the BMW out of the parking lot. The second unidentified male entered the Ford van and followed the BMW.

At about 12:43 p.m., Genualdi informed Biegalski that he observed the BMW enter the Green Valley Park Terrace apartment complex (the apartment complex). Biegalski had learned through the

interception of thousands of Gordon's telephone conversations that Gordon had three or four apartments at the apartment complex. One of the apartments was referred to as the lab, and it was used to store cocaine and money and to convert cocaine into crack cocaine.

On cross-examination, Biegalski testified that he did not have a physical description of the unidentified caller whom he had heard talking to Gordon during the 10:32 a.m. and the 11:47 a.m. telephone calls, nor did he have a description of the unidentified caller's automobile. The words "[s]now," "[d]ope," "[n]arcotics," and "[p]roduct" were never used during the telephone conversations, and the parties never mentioned a red car or a BMW. Biegalski knew the conversations concerned drugs. He did not hear any conversations that may have taken place in the BMW.

Genualdi testified that on September 8, 2003, Biegalski told him to establish surveillance at the bowling alley because a narcotics transaction was going to take place there. He arrived at the bowling alley at 11:30 a.m. and, at about 11:47 a.m., he saw a black male wearing a sleeveless light blue T-shirt, sitting in the driver's seat of a brown van, and talking on the phone. A couple of minutes later, he observed the van exit the parking lot. At about 11:50 a.m., he observed the van arrive at a BP gas station and pull into the gas line. Genualdi could see the gas station from his original surveillance point. He saw the black male exit the van, stand by the side of the van, and talk on the phone. Using his cell phone, Genualdi related his observations to Biegalski. Biegalski informed him that the van belonged to Gordon.

Genualdi testified that, a few minutes later, he observed a red BMW driven by a black male enter the bowling alley parking lot and park. Genualdi identified defendant as the driver of the red BMW. Shortly thereafter, Genualdi observed Gordon, who was driving the brown van, enter the

bowling alley parking lot and stop directly behind the BMW. He observed the trunk of the BMW open momentarily and then close. Then he saw defendant walk into the bowling alley. The brown van, driven by Gordon, exited the parking lot. Genualdi did not see any type of transaction take place between defendant and Gordon.

Genualdi testified that, at about 12:15 p.m., he walked into the bowling alley and saw defendant bowling. Genualdi used the bathroom, exited the bowling alley, and reentered his car. At about 12:25 p.m., Genualdi observed Gordon return to the bowling alley parking lot and park in the vicinity of the BMW. He also observed defendant standing at the entrance of the bowling alley with a black male. He then observed defendant and Gordon enter the BMW, with defendant entering the passenger side of the vehicle and Gordon entering the driver's side. He also observed the black male enter the van. Both vehicles left the parking lot. Genualdi followed the vehicles until they arrived at the apartment complex at about 12:43 p.m. Both vehicles entered the apartment complex. While these events were transpiring, Genualdi advised Biegalski of his observations.

Genualdi set up surveillance outside of the apartment complex. He had a view of the entrance and exit. At about 12:50 p.m., Genualdi observed defendant exit the apartment complex driving the BMW. There was no one else in the vehicle with defendant. Genualdi requested that a police officer pull over the BMW. After a police officer pulled defendant over, Genualdi stopped his vehicle, exited, and approached the BMW. Defendant immediately told Genualdi that he did not have permission to search the car. Genualdi searched the inside of the car, "[h]it the button for the trunk," and looked inside the trunk, where he saw a bowling bag. Genualdi opened up the side panel of the bowling bag and found a large quantity of cocaine.

On cross-examination, Genualdi testified that he did not hear any conversations that took place inside the BMW. He did not know defendant. Prior to instructing a police officer to pull over defendant's vehicle, he had not seen defendant commit any traffic violations. He had not seen any narcotics transactions. He did not have defendant's permission to search or a warrant. He did not know whether defendant was the same person whom Biegalski had heard speaking with Gordon on the telephone earlier that day.

On March 23, 2007, the trial court issued its ruling on defendant's motion. The court's factual findings are summarized as follows.

On September 8, 2003, the FBI had been investigating Gordon for one year and had monitored his phone calls for over three months. Both Biegalski and Genualdi had substantial experience in narcotics investigations. During the investigation, as Biegalski monitored Gordon's phone calls and Genualdi visually monitored the scene, Biegalski and Genualdi were in continual contact with each other.

At 10:30 a.m., Biegalski heard a phone conversation between Gordon and an unknown male. The "gist" of the conversation "based upon the agents' [sic] knowledge and his experience and the meaning of the terms that were used by the two individuals was that the unknown individual was seeking to purchase half of a kilogram." There was an indication that the speakers would meet at the bowling alley at noon. Biegalski "knew there was going to be a drug transaction. But no price had yet been agreed, and consequently he contacted Agent Genualdi with instructions to set up a surveillance at Bertrand's for what was anticipated to take place around twelve o'clock."

Within an hour, a call was intercepted between Gordon and Cooks, a known associate of Gordon, where Cooks was told to bring "one." Soon after, at 11:47 a.m., Biegalski heard a call

between Gordon and the unidentified individual from the prior call. Gordon told the caller "I'm there" and the unknown individual said "I'm about five minutes away."

At 11:52 a.m., Genualdi observed a red BMW enter the parking lot, and Gordon, driving a van, pulled in behind the BMW. The trunk of the BMW opened and closed. "He does not see anything or anyone get out at that point or put anything in the trunk." The van pulled out and left the area. The driver of the BMW went into the bowling alley. Genualdi entered the bowling alley and observed the driver of the BMW bowling. Genualdi identified defendant as that individual. Genualdi exited the bowling alley and returned to his car.

Five to ten minutes later, he saw Gordon return in the van with a second individual. Gordon and defendant left the bowling alley together in the BMW. The other individual followed behind in the van. Both vehicles drove to the apartment complex and entered the parking lot. Genualdi waited outside.

At about 12:50 p.m., Genualdi observed defendant exit the apartment complex driving the BMW. Genualdi requested that an officer pull over the BMW. After the officer pulled defendant over, Genualdi stopped his vehicle, exited, and approached the BMW. Defendant immediately told Genualdi that he did not have permission to search the car. Genualdi pushed the button in the car to open the trunk, opened a bowling bag located in the trunk, and found a large quantity of a powdery substance.

The court concluded as follows:

"So the totality of the circumstances as known by the officers, and this is a situation where the officers knew it wasn't imputing the knowledge of one to another, these officers knew, both of them, exactly what had transpired and what was transpiring as it occurred.

-7-

I do find that there was probable cause for the stop, the entrance of the trunk, and I do believe there was probable cause at the time because defendant clearly was seized, he was under arrest, there was probable cause at that time to arrest him. Consequently, and also there was probable cause to make the search and the seizure. So I am going to deny the motion to suppress."

The case proceeded to jury trial. At the close of the State's case, the court granted defendant's motion for a finding of not guilty with respect to the conspiracy charge. However, the jury found defendant guilty of unlawful possession of a controlled substance with the intent to deliver more than 400 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(C) (West 2002)), and the trial court sentenced him to 17 years' imprisonment. Defendant timely appealed.

Defendant argues that the trial court erred in denying his motion to suppress. In reviewing a ruling on a motion to suppress, we accept the trial court's findings of fact unless they are against the manifest weight of the evidence. People v. Luedemann, 222 Ill. 2d 530, 542 (2006). After we review the findings of fact under a manifest-weight standard, we review de novo the trial court's ultimate ruling. Luedemann, 222 Ill. 2d at 542. Here, defendant does not challenge any of the court's factual determinations; rather, he maintains that the court erred in its ultimate conclusion. Accordingly, our review is de novo.

The United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6. "A warrantless search and seizure is per se unreasonable unless an exception exists." People v. Stroud, 392 Ill. App. 3d 776, 803 (2009).

"Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they lawfully stop the vehicle and have probable cause to believe that the vehicle contains contraband or evidence of criminal activity. [Citation.] An officer may make a limited stop of an individual when the officer has a reasonable, articulable suspicion that a crime has been committed or is about to be committed. [Citation.] The reviewing court must look at the totality of the circumstances to determine whether the officer had a reasonable belief that the person was involved in criminal activity. [Citation.] Probable cause to search the vehicle exists where the totality of the facts and circumstances known to the officer at the time of the search, in light of the officer's experience, would cause a reasonably prudent person to believe that a crime had occurred and that evidence of the crime is contained in the automobile. [Citations.]" Stroud, 392 Ill. App. 3d at 803.

Even if Genualdi had reasonable suspicion to stop defendant's vehicle, we find that he did not have probable cause to search. The following cases are instructive.

In Sibron v. New York, 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968), the defendant was charged with unlawful possession of heroin, and he moved to suppress the evidence. At the hearing on the motion, the arresting officer testified that he had observed the defendant " 'continually from the hours of 4:00 p.m. to 12:00, midnight' " engaging in conversations with six to eight known drug addicts. Sibron, 392 U.S. at 45, 20 L. Ed. 2d at 924, 88 S. Ct. at 1893. He did not overhear any conversations or see anything pass between the defendant and the individuals. Later, the officer saw the defendant enter a restaurant and speak with three more known drug addicts. Again, the officer did not hear any conversations or see anything pass between the defendant and the individuals. The officer approached the defendant, asked him to come outside, and told the defendant, " 'You know

what I am after.' " Sibron, 392 U.S. at 45, 20 L. Ed. 2d at 925, 88 S. Ct. at 1894. According to the officer, the defendant reached into his pocket and took out several envelopes containing heroin. The trial court denied the defendant's motion to suppress. The Supreme Court reversed. The Court noted:

"The officer was not acquainted with [the defendant] and had no information concerning him. He merely saw [the defendant] talking to a number of known narcotics addicts over a period of eight hours. It must be emphasized that [the officer] was completely ignorant regarding the content of these conversations, and that he saw nothing pass between [the defendant] and the addicts. So far as he knew, they might indeed 'have been talking about the World Series.' The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." Sibron, 392 U.S. at 62, 20 L. Ed. 2d at 934, 88 S. Ct. at 1902.

Relying in part on Sibron, this court, in People v. Harper, 237 Ill. App. 3d 202 (1992), reversed the denial of the defendant's motion to suppress evidence. In Harper, the defendant was charged with unlawful possession of a controlled substance, and he filed a motion to suppress the evidence. At the hearing on the motion, the arresting officer testified that he was conducting surveillance on a " 'known dope house' " when he observed the defendant leave a parked car near the building, enter the building, remain for a short while, and leave. Harper, 237 Ill. App. 3d at 204. The officer did not see any transactions or hear any conversations. The officer also testified that he was aware that less than a year before the defendant's arrest, a search of the premises turned up narcotics, and he participated in a subsequent search that uncovered drug paraphernalia. He had also

arrested seven individuals near the building who possessed narcotics, and the defendant's behavior was consistent with the behavior of those individuals. The officer did not know the defendant, and he did not see the defendant once he entered the building. In reversing the denial of the defendant's motion to suppress, this court noted:

> "[T]he officers did not hear any conversations or observe anything which appeared to be a drug transaction. Indeed, they were completely unaware of what defendant did after he entered the building. He might well have knocked on an inner door, found no one at home, and left. The facts simply do not lead to an articulable suspicion that a crime had been committed." Harper, 237 Ill. App. 3d at 206.

In People v. Woods, 241 Ill. App. 3d 285 (1993), the defendant was charged with unlawful possession of less than 15 grams of a controlled substance, and he moved to suppress the evidence. At the hearing on the motion, a police officer testified that, while conducting surveillance on a " 'very active' " drug house, he observed three individuals enter the house and leave the house at various times. Woods, 241 Ill. App. 3d at 287. Each individual was arrested after exiting the house and found to be in possession of cocaine. The officer subsequently observed the defendant enter the house and emerge a few minutes later. He did not see the defendant engage in any transactions. The officer radioed other officers and told them to search the defendant for drugs. The defendant was stopped and found to be in possession of cocaine. The trial court denied the defendant's motion, and this court reversed. We stated: "The key to our holding is that, by their own admission, the police never saw defendant commit any act that appeared to be illegal. Rather, their suspicion was based on induction." Woods, 241 Ill. App. 3d at 289.

Here, as in <u>Sibron</u>, <u>Harper</u>, and <u>Woods</u>, because the agents never saw a transaction or exchange of any kind take place or witness any other criminal activity, they did not have probable cause to believe that a crime occurred and that evidence of a crime would be found in defendant's automobile. Even accepting, based on Biegalski's testimony concerning the telephone conversations, that a drug transaction was scheduled to take place, the agents had nothing more than a hunch that defendant was the expected buyer. In spite of the year-long investigation surrounding Gordon's narcotics activities, defendant was completely unknown to the agents. The agents had no way of determining whether defendant was the individual talking to Gordon on the phone or just a random acquaintance who happened to run into Gordon at the bowling alley.

The State maintains that the inference was "clear" that defendant was the buyer because he showed up at the bowling alley at the time of the alleged transaction. However, as noted by defendant, the bowling alley is a public establishment, and it is just as likely that defendant went there to bowl. Indeed, Genualdi testified that defendant entered the parking lot, exited his car, opened and closed his trunk, and went into the bowling alley where Genualdi later observed him bowling. After defendant entered the bowling alley to bowl, Gordon left the parking lot. There is no evidence of any conversations occurring between Gordon and defendant. There is certainly no evidence establishing that any transaction occurred at the bowling alley. And there is no testimony establishing what Gordon did between the time he left the parking lot and the time he returned at 12:25 p.m. Indeed, he could have left and conducted the drug transaction at that time with another party.

Even if the agents had reason to believe that defendant was the individual heard speaking with Gordon on the phone, Genualdi still had to have probable cause to believe that there was

evidence of the crime in the car. Although Gordon returned to the bowling alley at 12:25 p.m., entered defendant's BMW, and drove with him to the apartment complex, once at the apartment complex Genualdi did not observe defendant or Gordon enter or leave any apartment. There was no evidence of any conversations taking place between the two men. Genualdi did not observe any exchange of currency or narcotics at the apartment complex. He did not observe anyone carry anything into or out of an apartment. He did not observe anyone place a bowling bag into defendant's trunk. At most, Genualdi had the vaguest of hunches that defendant's trunk contained narcotics. Accordingly, we hold that he did not have probable cause to search defendant's trunk.

Accordingly, based on the foregoing, we reverse the denial of defendant's motion to suppress. The State has not requested a remand in the event of a reversal. Because the State will be unable to prove its case without the evidence of the narcotics, we reverse outright. See Harper, 237 Ill. App. 3d at 207.

Reversed.

O'MALLEY and JORGENSEN, JJ., concur.